[No. B193558. Second Dist., Div. Four. Mar. 4, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
GILBERT FELIX, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts A. and B. of the Discussion.

**COUNSEL**

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jaime L. Fuster and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MANELLA, J.—**

### RELEVANT PROCEDURAL HISTORY

On August 4, 2006, a third amended information was filed alleging that appellant Gilbert Felix had committed offenses on two different dates. In counts 1 and 3, the information charged appellant, respectively, with the

murder of Rasheed Coleman (Pen. Code, § 187, subd. (a))[1] and the attempted robbery of Arturo Rodriguez (§§ 211, 664) on or about July 27, 2003; in count 4, it charged appellant with the murder of Timothy Soto (§ 187, subd. (a)) on or about November 16, 2003. Under each count, the information alleged that appellant personally used a firearm (§ 12022.53, subds. (b), (c), (d)) and acted to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)); it also alleged under counts 1 and 4 that appellant committed the offenses as a participant in a criminal street gang (§ 190.2, subd. (a)(22)). In addition, it alleged under count 1 that appellant murdered Coleman due to his color (§ 190.2, subd. (a)(16)); and under count 4, that appellant had committed multiple murders (§ 190.2, subd. (a)(3)). Appellant pleaded not guilty to the charges and denied the special allegations.

The information also charged Michael Orozco—who is not a party to this appeal—with the murder of Coleman in count 2 and the attempted robbery of Rodriguez in count 3 (§§ 211, 664). Orozco entered into a plea agreement involving these charges, and testified as a prosecution witness at appellant's trial.

Prior to trial, the prosecutor dismissed count 3 and its accompanying allegations. On August 21, 2006, the jury found appellant guilty as charged, and found true the special allegations. On count 1, the trial court sentenced appellant to life imprisonment without the possibility of parole, and imposed consecutive terms, respectively, of 25 years to life and 10 years on the gun use and gang allegations (§§ 12022.53, subd. (d), 186.22, subd. (b)(1)). On count 4, it imposed an identical sentence (including the gun use and gang enhancements) consecutive to the term for count 1.

## FACTS

### A. *Prosecution Evidence*

#### 1. *Background*

In 2003, appellant belonged to the San Fer gang, which claims the communities of San Fernando and Sylmar as its territory. Los Angeles Police Department (LAPD) Officer Efren Gutierrez, a gang expert, testified that the San Fer gang has approximately 900 members, who engage in murder, attempted murder, robbery, auto theft, narcotics violations, and witness intimidation. Members of the San Fer gang other than appellant have been convicted in four separate cases of, respectively, assault with a firearm, grand theft auto, attempted murder, and criminal threats. These crimes had been

---

[1] All further statutory citations are to the Penal Code.

committed within three years of the murders charged against appellant. Officer Gutierrez opined that the San Fer gang constituted a "criminal street gang" (§ 186.22, subd. (b)(1)).

### 2. *Coleman's Murder*

On July 1, 2003, members of the Pacoima Piru Bloods, an African-American gang, murdered Steven Yuhasz, who belonged to the San Fer gang. According to Officer Gutierrez, Yuhasz's death was followed by several crimes against African-Americans, most of whom were not gang members, and he learned that the San Fer gang sought revenge on "any black within the community, whether or not they were in a gang." Michael Orozco, who belongs to the San Fer gang, testified that its gang members considered blacks to be their enemies.

During the evening of July 27, 2003, Rasheed Coleman, an African-American, went to a birthday party for Teresa Miranda and two of her cousins. He was accompanied by Michael Rosales, Michael's brother Alex and cousin Hector, and Arturo Rodriguez. The party occurred at a house on Sayre Street in or near Sylmar, and was attended by about 100 persons, including Anais Cordova and Melissa Fierro. At approximately 12:30 a.m., Cordova, Fierro, and a friend named "Lilly" went to a nearby gas station to use its restroom; they then returned to the party and parked on Sayre Street. According to Teresa Miranda, the party ended at a little before 1:30 a.m., and shortly thereafter she heard gunshots.

The key witnesses to the shooting were Michael Rosales, Anais Cordova, Melissa Fierro, and Michael Orozco. Rosales testified as follows: When he left the party with Coleman and his other companions, he saw appellant harassing a female, and heard her say, " 'Get away.' " Rosales approached the female, put his arm over her neck, and pretended to be her brother. While appellant retreated to a car, Rosales escorted the female back to the party and then rejoined his companions. As Rosales and the others walked to Coleman's car, appellant's car stopped in front of them. Appellant and other individuals left the car and asked, " 'Where are you from?,' " which Rosales understood to be a demand for a gang affiliation. When Rosales answered, " 'From nowhere' "—indicating that he and his friends did not belong to a gang—appellant or his comrades shouted " 'San Fer,' " and one attacked Arturo Rodriguez. Appellant approached Coleman—who was quietly standing nearby—and shot him with a handgun several times. Rosales acknowledged that he had been drinking alcohol, but indicated that he could recall the events.

Cordova testified that after she and her friends returned from the gas station and walked across the street toward the party, appellant put his arm

around her and invited her to another party. Appellant wore black jeans and a white Raiders jersey. When she tried to ignore appellant, another man appeared and told appellant he was with Cordova. As she walked away from appellant, he called her a bitch, turned his attention to Fierro, and then entered a car. Cordova later saw appellant standing in the middle of the street, where he held a gun up into air and then shot Coleman.

Fierro testified that when she and her friends returned from the gas station, she noticed a car in the street near the party. A man wearing a Raiders jersey talked to Cordova and Lilly, called them bitches, and then confronted Fierro. Another man she did not know approached her, pretended to be an acquaintance, and said, " 'Come on, let's go.' " She accompanied him because she knew he would lead her away from the man in the Raiders jersey. Later, she witnessed two groups arguing in the street and saw the man in the Raiders jersey fire a gun. She dropped to the ground and crawled behind a van. Fierro made little eye contact with the man in the Raiders jersey during these incidents, and did not identify him as appellant.

Orozco testified that during the night of July 27, 2003, he drove with appellant and two other San Fer gang members to a party on Sayre Street. Appellant had a gun. After they arrived at the party, appellant and Orozco left their car and met some girls who were leaving the party. When some men told the girls not to speak with appellant and Orozco, a fight began between Orozco and two Hispanic men, including Arturo Rodriguez. During the fight, Orozco heard gunshots and saw appellant firing a gun. Orozco and appellant then left in their car.

Coleman died of multiple gunshot wounds. Investigating officers found bullet fragments and 15 nine-millimeter shell casings at the site of the shooting. Starr Sachs, an LAPD firearms examiner, testified that the fragments could be from nine-millimeter bullets, or from .38- or .357-caliber bullets. LAPD Officer Mario Gallegos, who is assigned to the gang enforcement detail, noted that Coleman was the only African-American in Rosales's group, and opined that Coleman's murder by a San Fer gang member was significant because it occurred one month after Yuhasz's death.

### 3. *Soto's Murder*

In November 2003, Timothy Soto lived with his family in a cul-de-sac on Lyle Street in Sylmar. Soto was affiliated with the 18th Street gang, which is predominantly Hispanic, and a rival of the San Fer gang. According to Officer Gutierrez, generally only San Fer members lived in Sylmar.

At approximately 7:30 p.m. on November 16, 2003, Anthony Alcarez, a San Fer member, rode a bicycle to Soto's house and hailed him outside.

While Soto talked to Alcarez in front of Soto's house, Carlos Monterroso, who had just bought a DVD player, arrived on foot and asked whether he could borrow a DVD from Soto.

Monterroso testified as follows: After Soto went inside the house to retrieve a DVD, a black Impala and a second car entered the cul-de-sac and parked in front of the house. A female left the latter car and walked into the house. Appellant got out of the Impala, confronted Monterroso, and inquired whether he was Soto. When Monterroso responded in the negative, appellant asked whether he "was from 18th Street." Monterroso again said, " 'No.' " Appellant felt Monterroso's clothes for a weapon and told him to bring Soto out of the house. Monterroso answered that Soto would soon come outside. When Soto returned, appellant approached him and said, " 'Fuck 18th.' " Soto answered, " 'Why are you coming to my house disrespecting me?' " According to Monterroso, appellant then shot Soto, although he acknowledged that he could not see the gun from where he stood. Appellant fled as Monterroso ran for cover. The Impala drove away, and Soto's family emerged from the house.

Irene Ortiz testified that she drove to Soto's house to pick up her daughter on November 16, 2003. When she arrived at approximately 7:30 p.m., she saw a black car in front of the house and asked Soto—who was talking to some men—to tell her daughter that she was waiting in her car. Shortly thereafter, she heard a gunshot and saw Soto on the ground. The black car left immediately after the shot.

At trial, Ortiz stated that she was intoxicated at the time of the shooting, and could not identify the persons to whom Soto had spoken. According to investigating officers, when shown a photographic lineup after the shooting, Ortiz selected a photograph of appellant as the driver of the black car. She also told the officers that she was afraid of retaliation from the San Fer gang.

Soto's mother, Victoria Luna, testified that on November 16, 2003, Alcarez called Soto out of the house. When Soto returned, Monterroso came to the front door and told Soto that someone wanted to talk to him outside. After Soto left the house, Luna heard a shot and saw a black car leave the cul-de-sac.

Soto died of a single gunshot wound to his head. Police investigators found a partial bullet jacket from a .38-caliber or a nine-millimeter bullet at the site of the shooting. Orozco testified that in February 2004 or thereafter, appellant told him "[t]hat he had smoked some fool from [the] 18th Street [gang]" who lived in a cul-de-sac. Officer Gutierrez opined that appellant murdered Soto because he belonged to a rival gang and had been "slipping," that is, living in territory claimed by the San Fer gang.

### 4. Search of Appellant's House

On February 5, 2004, investigating officers searched appellant's residence and found indicia of his membership in the San Fer gang, including photographs of appellant with San Fer gang members. In addition, they discovered a shotgun registered to appellant's father, as well as five .357-caliber bullets, one .38-caliber bullet, one .40-caliber bullet, and six boxes of .22-caliber bullets.

### B. Defense Evidence

Leendert Hoogstad, who works for an entertainment-related company, testified that he had employed appellant from 2002 until his arrest, and that appellant was "in good stead" with Hoogstad's firm. Nanette Felix, appellant's mother, testified that her husband owned a .22-caliber rifle and a shotgun. She also testified that someone had stolen a handgun of an unknown caliber from her garage in 1984. According to Nanette Felix, she and her husband "like[d] guns."

## DISCUSSION

Appellant contends that trial court (1) improperly consolidated the charges against him, (2) admitted irrelevant evidence, and (3) misinstructed the jury.

### A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. Instructional Error

Appellant raises numerous challenges to the new Judicial Council of California CALCRIM instructions that were provided to the jury at his trial. For the reasons explained below, we find no instructional error.

■ At the threshold, respondent argues that appellant waived or forfeited these contentions by failing to raise them before the trial court. However, a defendant need not assert an objection to preserve a contention of instructional error when the error affects the defendant's "substantial rights." (§ 1259.) In this regard, "[t]he cases equate 'substantial rights' with reversible error" under the test stated in *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978 [125 Cal.Rptr. 419].)

---

*See footnote, *ante*, page 849.

Here, appellant contends that the purported instructional errors at issue implicate his substantial rights; moreover, to the extent that his counsel's failure to object worked a forfeiture, he contends that his counsel rendered ineffective assistance. We address his contentions on the merits to determine whether there was an impairment of his substantial rights or ineffective assistance of counsel. (See *People v. Anderson* (2007) 152 Cal.App.4th 919, 927 [61 Cal.Rptr.3d 903] (*Anderson*).)

Aside from the instructions we discuss below, appellant attacks Judicial Council of California Criminal Jury Instructions (2007–2008) CALCRIM Nos. 200, 220, 223, 226, 300, 302, 316, 355, and 370, as well as the use of the term "you" throughout the CALCRIM instructions. In *Anderson, supra,* 152 Cal.App.4th at pages 927–952, and *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1179–1198 [67 Cal.Rptr.3d 871] (*Ibarra*), the courts confronted identical contentions regarding these instructions and the term "you," and rejected them following a careful analysis. Because we find *Anderson* and *Ibarra* dispositive of these matters, we adopt their reasoning and conclusions, and limit our review to appellant's remaining contentions.

### 1. *CALCRIM No. 315*

Appellant contends that CALCRIM No. 315 improperly limited the factors the jury could consider in evaluating eyewitness testimony. As provided to the jury, this instruction stated in pertinent part, "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] *In evaluating identification testimony, consider the following . . . .*" (Italics added.) Thereafter, the instruction listed several factors. Appellant argues that the portion of the instruction italicized here precluded the jury from considering other factors.

■ This contention fails in light of the other instructions that the jury received. "In assessing [appellant's] claim of error, we consider the entire charge to the jury and not simply the asserted deficiencies in the challenged instruction. [Citation.] A trial court is not obliged to condense the required explanation of a legal rule or concept in a single instruction; a charge is not erroneous or prejudicial simply because a required explanation is given in two instructions rather than one. [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 649 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

■ Aside from CALCRIM No. 315, the jury also received CALCRIM No. 226, which states in pertinent part: "In evaluating a witness's testimony, you may consider *anything* that reasonably tends to prove or disprove the truth or accuracy of that testimony." (Italics added.) Because CALCRIM

No. 315 advised the jury to evaluate an eyewitness as it would "any other witness," CALCRIM No. 315 did not oblige the jury to disregard factors not listed in the instruction. Reasonably viewed, CALCRIM No. 315 directed the jurors' attention to the listed factors, but permitted them to consider other factors. There was no instructional error.

### 2. CALCRIM No. 318

Appellant contends that the term "may" in CALCRIM No. 318 improperly encouraged the jury to ignore or neglect evidence presented at trial. As provided to the jury, CALCRIM No. 318 stated: "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable; [¶] AND [¶] 2. As evidence that the information in those earlier statements is true."

In *Anderson*, the court rejected essentially the same contention regarding CALCRIM No. 316, which states that if the jury finds that a witness has committed a felony, crime, or other misconduct, it "may consider that fact only in evaluating the credibility of the witness's testimony." (*Anderson*, *supra*, 152 Cal.App.4th at pp. 940–941.) As the court explained, CALCRIM No. 316 must be read in light of other instructions, including CALCRIM No. 220, which instructs the jury to consider " 'all the evidence that was received throughout the entire trial.' " (*Anderson*, *supra*, 152 Cal.App.4th at p. 940; see also *People v. Solorzano* (2007) 153 Cal.App.4th 1026, 1038–1039 [63 Cal.Rptr.3d 659].) Accordingly, CALCRIM No. 316, viewed in context, instructs the jury "how prior crimes evidence may be used," but does not suggest that it may neglect evidence. (*Anderson*, *supra*, 152 Cal.App.4th at pp. 940–941, italics deleted.)

Because the jury received CALCRIM No. 220 and other pertinent instructions, this rationale encompasses appellant's challenge to CALCRIM No. 318. Viewed in context, the instruction provided proper guidance about how the jury may use witness testimony, and did not encourage it to neglect or ignore the testimony.

### 3. CALCRIM No. 332

Appellant contends that CALCRIM No. 332, which addresses expert witness testimony, improperly directed the jury to assess defendant's guilt in light of matters not admitted as evidence at trial. CALCRIM No. 332, as provided to the jury, stated: "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion

are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. *You must decide whether information on which the expert relied was true and accurate.* You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (Italics added.)

Appellant contends that the italicized portion of the instruction directed the jury to consider the foundation of expert witness testimony, which may rest on hearsay and facts not admitted into evidence. He thus argues that the instruction advises juries to determine the truth or accuracy of matters not presented at trial, and obliges them to speculate or "perform the impossible." We disagree.

■ Appellant's contention ignores the sentences immediately preceding and following the italicized sentence, as well as other instructions given to the jury. The preceding sentence groups "information on which the expert relied" with other matters that the expert disclosed *at trial,* namely, the expert's qualifications and reasons for his or her opinions; the following sentence permits the jury to reject expert opinions unsupported by *the evidence.* Moreover, the jury received CALCRIM Nos. 201 and 222, which, respectively, forbid independent investigation and inform the jurors that they "must use only the evidence that was presented in [the] courtroom." Viewed in context, the sentence appellant challenges directed the jury to examine any "information on which the expert relied" that was disclosed at trial, and to assess its value on the basis of the evidence admitted at trial.

■ This task is neither impossible nor improper. As our Supreme Court indicated in *People v. Dunkle* (2005) 36 Cal.4th 861, 899 [32 Cal.Rptr.3d 23, 116 P.3d 494], juries are properly instructed to assess critically the disclosed factual basis of an expert opinion. Accordingly, there was no instructional error.

### 4. *CALCRIM No. 700*

Appellant contends that the jury was improperly instructed with CALCRIM No. 700, which states: "If you find the defendant guilty of first degree murder, you must also decide if the People have proved that one or more of the special circumstances is true. [¶] The People have the burden of proving each special circumstance beyond a reasonable doubt. If the People have not met this burden, you must find the special circumstance has not been proved. You must return a verdict form stating true or not true for each special

circumstance on which you all agree. [¶] *In order for you to return a finding that a special circumstance is or is not true, all 12 of you must agree. . . ."* (Italics added.)

Appellant argues that the italicized portion of the instruction is defective because it does not explain the nature of the agreement the jurors must reach. The crux of his contention is that the instruction should inform jurors that "[t]he only agreement that is sufficient to convict is one in which all jurors have 'found' all essential facts and elements of the charged special circumstance beyond a reasonable doubt."

In our view, the requisite clarification is disclosed when the italicized sentence is read in the context of CALCRIM No. 700 as a whole, together with CALCRIM Nos. 220 and 3550, which the jury also received. CALCRIM No. 220 states in pertinent part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of a crime and special allegation beyond a reasonable doubt." Moreover, CALCRIM No. 3550 states in pertinent part: "Your verdict on each count and any special findings must be unanimous. This means that, to return a verdict, all of you must agree to it." These instructions, viewed collectively, informed the jury that it could not find a special allegation true unless every juror agreed that the prosecutor had proved each element of the allegation beyond a reasonable doubt.

### 5. CALCRIM No. 704

Appellant contends that CALCRIM No. 704, which addresses the use of circumstantial evidence to establish special allegations, improperly defines the prosecutor's burden of proof. As provided to the jury, this instruction stated in part: "Before you may rely on circumstantial evidence to conclude that a special circumstance allegation is true, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt."[8] Appellant argues that the instruction does not require jurors to *find*

---

[8] CALCRIM No. 704, as given to the jury, states in full: "Before you may rely on circumstantial evidence to conclude that a special circumstance allegation is true, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find that a special circumstance allegation is true, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the special circumstance allegation is true. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the special circumstance allegation is true and another reasonable conclusion supports a finding that it is not true, you must conclude that the allegation was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

"guilt" beyond a reasonable doubt, but "merely requires . . . jurors to be 'convinced' the defendant is guilty," regardless whether the evidence actually proves guilt beyond a reasonable doubt.

■ In *Anderson*, the court rejected a similar challenge to CALCRIM No. 224, which closely resembles CALCRIM No. 704, but addresses the use of circumstantial evidence to establish guilt.[9] The court noted that CALCRIM No. 224 does not define the burden of proof, which is done in CALCRIM No. 220. (*Anderson, supra*, 152 Cal.App.4th at p. 934.) Rather, CALCRIM No. 224 describes a threshold inquiry regarding the use of circumstantial evidence: "Before such evidence may be considered, the jury must conclude, i.e., be *convinced*, the only reasonable inference from the evidence points to the defendant's guilt." (*Anderson, supra*, 152 Cal.App.4th at p. 934.) Because CALCRIM No. 704 describes the analogous threshold inquiry regarding the use of circumstantial evidence to establish special allegations, appellant's challenge to CALCRIM No. 704 fails for the reasons stated in *Anderson*.

### 6.   *CALCRIM No. 706*

Appellant contends that the trial court erred in instructing the jury with CALCRIM No. 706, which states: "In your deliberations, you may not consider or discuss penalty or punishment in any way when deciding whether a special circumstance, or any other charge, has been proved." Appellant argues that this instruction improperly barred the jury from considering whether Orozco's credibility was impaired by his plea bargain agreement, which he described during his testimony. We disagree.

In *People v. Jones* (2003) 30 Cal.4th 1084, 1114 [135 Cal.Rptr.2d 370, 70 P.3d 359], our Supreme Court confronted a contention similar to that raised here. There, the defendant's accomplices—who had entered into plea bargain agreements—testified against the defendant, and the trial court gave CALJIC Nos. 8.83.2 and 17.42, which, like CALCRIM No. 706, advise juries

---

[9] CALCRIM No. 224 states: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

to set aside the subject of penalty or punishment in their deliberations.[10] (*People v. Jones, supra,* 30 Cal.4th at pp. 1106–1108, 1114.) The court concluded: "In light of the instructions given and arguments presented, a reasonable juror would recognize that instructions barring discussion of punishment—which serve the obvious purpose of preventing discussion of a *defendant's* punishment at the guilt phase of the trial [citation]—do not prohibit a juror from considering the punishment the accomplices faced and what they actually received in assessing the credibility of their testimony. [Citation.]" (*Id.* at p. 1114.)

■ *Jones* is dispositive of appellant's contention. Aside from CALCRIM No. 318, which addresses the relevance of prior crimes to witness credibility, the jury received CALCRIM No. 226, which identifies other factors affecting witness credibility, including whether the witness is influenced by "bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided." In addition, the jury received CALCRIM No. 334, which informed the jury that it could not find that appellant murdered Coleman solely on the basis of Orozco's testimony if it determined that Orozco was an accomplice to the murder. During closing argument, defense counsel contended that Orozco was not a credible witness, and that he had become "the golden boy of the prosecution" only because he had become a "squealer" to avoid "sitting in the defendant's chair." Under these circumstances, the jury could not reasonably have understood CALCRIM No. 318 to bar consideration of Orozco's plea bargain agreement.

### 7. *CALCRIM Nos. 729 and 736*

Appellant contends that the jury was improperly instructed with CALCRIM Nos. 729 and 736, which define the elements of the special allegations regarding, respectively, murder due to the victim's color and murder while a gang member. He argues that the instructions, as provided to the jury, were defective because they did not advise the jury that the special allegations were true only if appellant was the actual killer.[11]

■ This contention fails in light of other instructions provided to the jury, including CALCRIM Nos. 520, 521, and 700. CALCRIM Nos. 520 and 521

---

[10] CALJIC No. 8.83.2 states: "In your deliberations the subject of penalty or punishment is not to be discussed or considered by you. That is a matter which must not in any way affect your verdict or affect your finding as to the special circumstance[s] alleged in this case."

CALJIC No. 17.42 states: "In your deliberations do not discuss or consider the subject of penalty or punishment. That subject must not in any way affect your verdict."

[11] CALCRIM No. 729, as given to the jury, states: "The defendant is charged with the special circumstance of murder committed because of the deceased's color. [¶] To prove that this special circumstance is true, the People must prove that the defendant intended to kill because of the deceased person's color. [¶] If the defendant had more than one reason to

identify the elements of first degree murder, including the requirement that "[t]he defendant committed an act that caused the death of another person." CALCRIM No. 700 states: "*If* you find the defendant guilty of first degree murder, you *must also* decide if the People have proved that one or more of the special circumstances is true." (Italics added.) Because the instructions, viewed in their entirety, directed the jury to consider the truth of the special allegations only after determining that appellant was the actual killer, there was no error. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [74 Cal.Rptr.2d 212, 954 P.2d 475] [instructions are adequate when element omitted in one instruction is clearly supplied in other instructions].)

### 8. *CALCRIM No. 3146*

Appellant challenges CALCRIM No. 3146, which defines the elements of the special allegation regarding personal gun use. As provided to the jury, this instruction stated in pertinent part: "If you find the defendant guilty of the crimes charged in Counts 1 and 4, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally used a firearm during the commission of that crime. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime." Appellant contends that the phrase "must decide," as used in the first and second sentence, is coercive and improperly directed the jury to make a finding. He acknowledges that the jury also received CALCRIM No. 3550, which advised the jurors, "You should try to agree on a verdict if you can," but argues that the jury may not have heeded CALCRIM No. 3550.

■ In *Anderson*, the court rejected an identical challenge to CALCRIM No. 3145, which defines the elements of an enhancement for deadly weapon use, and is materially similar to CALCRIM No. 3146.[12] The court stated:

commit the murder, the deceased person's color must have been a substantial factor motivating the defendant's conduct. A substantial factor is more than a trivial or remote factor, but it does not need to be the only factor that motivated the defendant."

CALCRIM No. 736, as given to the jury, states in pertinent part: "The defendant is charged with the special circumstance of committing murder while an active participant in a criminal street gang. [¶] To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intended to kill; [¶] 2. At the time of the killing, the defendant was an active participant in a criminal street gang; [¶] 3. The defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; [¶] AND [¶] 4. The murder was carried out to further the activities of the criminal street gang. . . ."

[12] CALCRIM No. 3145 states in pertinent part: "If you find the defendant guilty of the crime[s] charged in Count[s][,] . . . you must then decide whether[, for each crime,] the People have proved the additional allegation that the defendant personally used a deadly [or dangerous] weapon during the commission . . . of that crime. [You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.]"

"CALCRIM No. 3550[] clarifies that the jury need only try [to] reach a decision on the matters at issue. Defendant argues there is no assurance the jury will follow CALCRIM No. 3550. **(10)** However, we presume the jury followed the instruction as given. (*People v. Adcox* [(1988)] 47 Cal.3d [207,] 253 [253 Cal.Rptr. 55, 763 P.2d 906].)" (*Anderson, supra,* 152 Cal.App.4th at p. 951.) In our view, *Anderson* is dispositive of the contention raised here.

### 9. *CALCRIM No. 3515*

Appellant challenges CALCRIM No. 3515, which states: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." He asserts three contentions of error regarding this instruction.

First, appellant argues that the first sentence failed to inform the jury that each charged count was a separate *alleged* crime, and thus the instruction amounted to improper comment on the evidence. However, the jury also received CALCRIM No. 220, which explains that "[t]he fact that a criminal charge has been filed against the defendant is *not* evidence that the charge is true" (italics added), and that the prosecutor is obliged to prove each element of the crimes. In view of this instruction, CALCRIM No. 3515 cannot reasonably be interpreted as suggesting the charged counts constitute proven crimes.

Second, appellant argues that the second sentence improperly informed the jury that they must return verdicts. We disagree. The second sentence, viewed in the context of all the instructions, is reasonably understood only to direct the jury to consider and decide each count separately. As we have explained (see pt. C.8., *ante*), the jury was also instructed with CALCRIM No. 3550, which advised the jurors: "You should try to agree on a verdict if you can." Accordingly, the instructions, taken as a whole, did not tell the jury that it must reach verdicts.

Third, appellant argues that the second sentence failed to explain that a verdict on one count "should not influence" the verdict on any other count. In *People v. Bloyd* (1987) 43 Cal.3d 333, 356 [233 Cal.Rptr. 368, 729 P.2d 802], our Supreme Court rejected this objection to the instructions given there as "de minimis." We follow *Bloyd* on this matter. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)[13]

---

[13] Because we conclude that there was no instructional error, we do not address appellant's contention that his counsel rendered ineffective assistance by failing to object to the instructions.

## DISPOSITION

The judgment is affirmed.

Epstein, P. J., and Suzukawa, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 11, 2008, S162669.