Filed 12/2/13  P. v. Roa CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS MANUEL ROA,<br><br>    Defendant and Appellant. | D063110<br><br><br>(Super. Ct. No. SCE314715) |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed.

Martha L. McGill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Marissa Bejarano, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted Jesus Manuel Roa of unlawful sexual intercourse with a child under the age of ten (Pen. Code, § 288.7, subd. (a)),[1] forcible lewd acts with a child under the age of 14 (§ 288, subd. (b)(1)), and lewd acts with a child under the age of 14 (§ 288, subd. (a)). The jury found that Roa had engaged in substantial sexual contact with the victim, A.A., within the meaning of section 1203.066, subdivision (a)(8). Following his conviction, the court sentenced Roa to prison for an indeterminate term of 25 years to life, plus a consecutive determinate term of 16 years.

Roa appeals, contending that the court erred in admitting expert testimony relating to the behavior of child abuse victims, often called "child sexual abuse accommodation syndrome" or "CSAAS" evidence (CSAAS). He further contends that the court's limiting instruction on CSAAS evidence, CALCRIM No. 1193, was erroneous even if such evidence was properly admitted. We affirm the judgment.

FACTS

Roa was in a relationship with T.P. for approximately nine years. Their relationship resulted in four children. T.P. also had a fifth child, A.A., from a previous relationship. Following time apart, Roa and T.P. lived together, with the children, for a period of several months in 2009. T.P. then moved out because she married another man, though the five children stayed with Roa off and on for several additional months. At some point, the children came to permanently live with T.P. and her new husband.

---

[1]      Further statutory references are to the Penal Code unless otherwise noted.

While he lived together with the children in 2009, Roa began to molest A.A. Roa placed his hand on A.A.'s vagina, touched and rubbed A.A.'s vagina with his finger, and penetrated her vagina with his finger, both over her underwear and with her underwear pulled down. On at least one occasion, Roa held down A.A. during the molestation. During the final episode of molestation, Roa forced his penis into A.A.'s vagina. Roa told A.A. not to tell anyone about the molestation, and on one occasion threatened to hit her if she told.

Around the time of the molestation, both T.P. and I.A., A.A.'s step-mother, found spots of blood on A.A.'s underwear. Also around this time, A.A. told I.A. that she was afraid of Roa, that she was hiding from Roa, and that she did not want to be around Roa.

At least a year later, after A.A. and her half-siblings had permanently moved in with T.P. and her husband, A.A. complained to T.P. about discomfort in her vaginal area. T.P. examined the area, which was inflamed and appeared injured. A.A. then told T.P. that Roa had touched the vagina of one of A.A.'s half-sisters. T.P. asked A.A. if she too had been molested by Roa, and A.A. answered yes. A.A. later said that she had not seen her half-sister and Roa engaged in any sexual behavior, but she confirmed that she herself had been molested. She said that Roa had touched her vagina and put his fingers inside her vagina.

The day after these disclosures, T.P. took A.A. to a sheriff's station. A.A. was profoundly upset and unable to give a statement to a sheriff's deputy. Several days later, A.A. was questioned by a forensic interviewer specializing in child abuse, and she

3

described her molestation by Roa. Again, A.A. stated that Roa had touched her vagina and put his fingers inside her vagina.

Under questioning by the sheriff's department, Roa admitted inappropriate contact with A.A. He admitted placing his fingers on A.A.'s vagina on two occasions, but he contended that it was accidental. Roa stated that he was sleeping in the same bed as A.A. and, while he was sleeping, mistook A.A. for T.P. Roa said that he told A.A. that he was sorry, and that it was an accident, but that she should not tell anyone because Roa could get in trouble. An investigator with the sheriff's department suggested that Roa write an apology letter to A.A. Roa did so. In the letter, Roa wrote that he was sorry for touching A.A. the "wrong way" on her "privates." Sometime later, Roa was taken into custody.

Following Roa's arrest, T.P. showed A.A. the teen comedy *Easy A*. The plot of the movie revolves around sexual conduct and, in particular, one character's infection with Chlamydia. The movie prompted a number of questions from A.A. to T.P. regarding sex and sexually transmitted diseases. During the resulting discussion, A.A. again complained of discomfort in her vaginal area. A.A. became upset and, in response to T.P.'s questioning, told T.P. that Roa had put his penis into her vagina. A.A. told T.P. that she was too scared to disclose this additional molestation before. Later, A.A. told a forensic interviewer that she had forgotten this additional molestation and that the movie reminded her. Medical examination could neither confirm nor rule out sexual abuse.

Roa was tried before a jury on five felony charges stemming from A.A.'s allegations of abuse. At trial, the People called Laurie Fortin, a forensic interviewer and licensed social worker, to testify regarding the behavior of children who have been

4

sexually abused. Fortin identified certain commonly-held myths and misconceptions surrounding children who have been sexually abused, including that such children usually report the abuse immediately. Fortin testified that, in reality, children who are sexually abused often delay disclosing the abuse and, even then, make only incremental disclosures over an extended period of time. Fortin also testified that the child's statements may be inconsistent, as the story is retold multiple times.

During Fortin's testimony, the People played two videotaped forensic interviews with A.A. Fortin used examples from those interviews in her testimony about incremental disclosures. Fortin testified, "So what [A.A.] described is exactly what we would expect. She only talks about one thing with [the social worker]. But when she comes into a different setting, there may be additional things that come out, because the questioning is going to be different, and the purpose of the interview is different. . . . My experience is that as kids get in counseling, which we make a referral for, even more may come out. And there may be certain things within the environment or things they are exposed to that all of a sudden just trigger an additional memory for them that they may have forgotten, or pushed away, or denied to themselves or to others." The People asked Fortin whether the "two videos, or any of the questions [the interviewer] asked, or any of the responses, or the pattern of disclosure that you saw" raised "any red flags that you saw or any indications or inconsistencies that you observed in either of the two videos." Fortin responded, "None that are atypical from what is pretty common, from my experience."

Fortin also testified about interviewing techniques, the importance of asking open-ended questions, and the role of the forensic interviewer, which is not to determine whether or not a child is telling the truth. Both the People and Roa's counsel questioned Fortin extensively regarding hypothetical interview questions, where they fell on the spectrum of leading to open-ended, and the effects of such questions on a child's statements.

Prior to trial, Roa had moved *in limine* to exclude Fortin's testimony regarding the behavior of sexually-abused children under Evidence Code, section 352. Roa argued that testimony such as Fortin's, or CSAAS testimony, was unreliable, not probative to any issue in the case, and would confuse and mislead the jury. Roa also requested a limiting instruction that "the testimony is introduced to dispel a myth [and] the jury must not use that evidence to predict a [molestation] has been committed," should Fortin's testimony be admitted over his objection. Roa did not specify a particular instruction and did not reference CALCRIM No. 1193, which deals with CSAAS testimony. The court denied Roa's motion *in limine* but placed limits on the scope of Fortin's testimony. The court appears to have suggested *sua sponte* that CALCRIM No. 1193 be given to the jury. Roa did not object.

CALCRIM No. 1193 was in fact given to the jury in connection with CALCRIM No. 303, and with some embellishments, as follows:

> "THE COURT: You have heard testimony from Laurie Fortin regarding child abuse. Laurie Fortin's testimony about child abuse is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Alyssa A.'s conduct was not inconsistent with the

6

conduct of someone who has been molested and in evaluating the believability of her testimony.

"THE PEOPLE:  Could I interrupt?

"THE COURT:  Yes.

"THE PEOPLE:  The name you mentioned was Alyssa.

"THE COURT:  [A.A.].  I'm sorry.  I said Alyssa.  It should be [A.A.].  Excuse me . . . It's [A.A.].  My apologies.  During the trial certain evidence was admitted for a limited purpose, and you may consider that evidence only for the purpose and for no other.  That goes back to Laurie Fortin's testimony regarding the child abuse accommodation syndrome."

During their closing argument, the People referenced Fortin's testimony several times.  For example, the People argued, "Why else believe everything A.A. has said is the absolute truth?  The expert witness told us that the evidence in this case is completely consistent with the reported behavior.  The disclosure was delayed.  It took her over two years.  Then when she started to disclose the information it came out in pieces.  Completely normal."  The People further stated, "[T]here is nothing that the two experts in the field say which should raise any red flags or anything inconsistent at all with what A.A. has said."[2]

During Roa's closing argument, his counsel repeatedly questioned A.A.'s credibility.  Roa's counsel stated, "On cross-examination [of a sheriff's detective] I pointed out just a couple of the inconsistencies between the preliminary hearing and A.A.'s trial testimony. . . .   I was able to point out that A.A. lied as well about using the

---

[2]     The "two experts" referenced by the People appear to be Fortin and Dr. Joyce Adams, who conducted the medical examination of A.A.

7

word 'berdy.' She was willing to lie at the preliminary hearing and say they had no other word for it. . . . The inconsistencies in A.A.'s statements are clear." Roa's counsel provided several additional examples of alleged inconsistencies in A.A.'s statements.

DISCUSSION

I

Roa contends that the court erred by denying his motion *in limine* to exclude Fortin's testimony pursuant to Evidence Code, section 352. Roa argues that the testimony lacked probative value, was not helpful to the trier of fact, and created a substantial risk that the jury would misuse Fortin's testimony as evidence of guilt.

Section 352 of the Evidence Code states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Rulings under Evidence Code section 352 come within the trial court's discretion and will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.) "A trial court's discretionary ruling under this statute ' "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice." ' [Citation.]" (*People v. Williams* (2008) 43 Cal.4th 584, 634-635.)

Here, the court's denial of Roa's motion *in limine* regarding CSAAS evidence was not an abuse of discretion. As noted above, CSAAS evidence refers to the common reactions of child molestation victims, such as delayed reporting and retraction. (*People*

8

*v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*); see *People v. Bowker* (1988) 203 Cal.App.3d 385, 389, 392-394.) Such testimony is admissible in California for limited purposes. "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin, supra,* 53 Cal.3d at p. 1300.) The expert testimony is "admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.)[3]

Relying on out-of-state authorities and legal commentary, Roa first argues that California authority on this issue should be reconsidered and CSAAS testimony held inadmissible for all purposes. We disagree. Our Supreme Court has repeatedly and approvingly cited authorities allowing the use of CSAAS evidence, and it has ratified the reasoning underlying the admission of such evidence. For example, in *McAlpin, supra,* the court considered the admission of expert testimony regarding the response of *parents* of abused children to their children's trauma. (53 Cal.3d at p. 1300.) After discussing the authorities approving of CSAAS evidence, the court analogized those authorities to the

---

[3]     CSAAS, developed as a therapeutic tool, describes five stages of the syndrome, including secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction. (*People v. Bowker, supra,* 203 Cal.App.3d at p. 389.) The shorthand term "CSAAS evidence" does not necessarily refer to all of these stages, but encompasses the aspects that are relevant to rebut misconceptions about a child's reaction to abuse. (See *id.* at p. 391, and fn. 8.)

9

case before it: "In the case at bar the challenged expert testimony dealt with the failure not of the child victim, but of the child's parent, to report the molestation. Yet the foregoing rules appear equally applicable in this context." (*Id.* at p. 1301.) The court found no abuse of discretion in the admission of such testimony. (*Id.* at p. 1302.) The court later analogized expert testimony regarding the behavior of domestic violence victims to CSAAS evidence, and it found such testimony admissible in the domestic violence context. (*People v. Brown* (2004) 33 Cal.4th 892, 906-907; see also *People v. Ward* (2005) 36 Cal.4th 186, 211 [expert testimony on gang culture].) We are bound to follow the clear import of our high court's rulings, and we therefore decline to overturn California's long-standing rule allowing CSAAS evidence. (See *People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

Roa further argues that the court abused its discretion in admitting CSAAS evidence under the circumstances of this case. Roa contends that CSAAS evidence was not probative because it incorrectly relies on the assumption that certain behaviors are unique to children who have been sexually abused. We discern no such assumption in the CSAAS evidence offered in this case.[4] On the contrary, the evidence showed that the victim's response to child abuse may be the explanation for behavior that would

---

[4]    We have explained that "[i]t is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested. It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused. The former may be appropriate in some circumstances; the latter . . . clearly is not." (*People v. Bowker, supra*, 203 Cal.App.3d at p. 393.) Roa appears to be arguing that the CSAAS evidence in this case falls within the latter category. Based on our review, the record does not substantiate Roa's argument.

10

otherwise undermine the victim's credibility. This is a recognized and proper purpose for CSAAS evidence. (See *McAlpin, supra*, 53 Cal.3d at p. 1301 [" 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' [Citation.]"].)

We likewise reject Roa's contention that CSAAS evidence was not beyond the common knowledge and experience of jurors and thus was not proper expert testimony. (See Evid. Code, § 801.) Most jurors, thankfully, were not sexually abused themselves as children, nor do they have knowledge and experience regarding child sexual abuse. The behavior of sexually abused children therefore falls outside their common experience. As our Supreme Court has explained, with respect to the parents of sexually abused children, expert testimony on the behavior of such individuals "would therefore 'assist the trier of fact' (Evid. Code, § 801, subd. (a)) by giving the jurors information they needed to objectively evaluate [the individual's] credibility." (*McAlpin, supra*, 53 Cal.3d at p. 1302.) The same principle applies here as well. (See *People v. Perez, supra*, 182 Cal.App.4th at p. 245.)

Finally, Roa contends that the danger of unfair prejudice, based on the risk that jurors would misinterpret CSAAS evidence as direct evidence of guilt, substantially outweighed any probative value. We disagree. CSAAS evidence has probative value, and is admissible, to assess the credibility of an alleged victim of sexual abuse. (*McAlpin, supra*, 53 Cal.3d at p. 1300 ["[I]t is admissible to rehabilitate such witness's

credibility when the defendant suggests the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.]"]; *People v. Perez, supra*, 182 Cal.App.4th at p. 245.) Roa's defense put the credibility of the victim here at issue. Based on our review of the record, the probative value of CSAAS evidence was not substantially outweighed by the danger of misinterpretation identified by Roa. (See Evid. Code, § 352; *People v. Stark* (1989) 213 Cal.App.3d 107, 114-115.) Moreover, the court properly instructed the jury that CSAAS evidence was not direct evidence of guilt, thus minimizing any risk of misinterpretation by the jury.[5] We therefore find no abuse of discretion in the court's denial of Roa's motion *in limine* seeking to exclude CSAAS evidence. Because we hold there was no error in the court's denial of Roa's motion *in limine*, we need not address his arguments regarding the effect of the alleged error.

## II

Roa argues that, even if CSAAS evidence were properly admitted, the court erred by instructing the jury with CALCRIM No. 1193.[6] Roa contends that CALCRIM No. 1193 improperly allows the use of CSAAS evidence as direct evidence of guilt

---

[5] Roa's further contention regarding the adequacy of the court's limiting instruction is discussed in the next section, *post*.

[6] CALCRIM No. 1193 provides as follows: "You have heard testimony from [expert] regarding child sexual abuse accommodation syndrome. [Expert]'s testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her). You may consider this evidence only in deciding whether or not [victim]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

because it instructs the jury that they may use the evidence "in evaluating the believability of [the victim's] testimony."  Roa argues that this portion of CALCRIM No. 1193 effectively gave the jury license to consider CSAAS testimony "to determine whether the victim's molestation claim is true."  (See *People v. Housley* (1992) 6 Cal.App.4th 947, 959.)

Roa did not object to CALCRIM No. 1193 in the trial court.  However, "a defendant need not assert an objection to preserve a contention of instructional error when the error affects the defendants 'substantial rights.'  [Citation.]"  (*People v. Felix* (2008) 160 Cal.App.4th 849, 857.)  We therefore consider the merits of Roa's claim of error.  (See *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 ["Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim . . . ."].)

"[A]ssertions of instructional error are reviewed de novo."  (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838.)  The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law . . . ."  (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.)  " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [']  [Citation.]"  (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)  "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are

reasonably susceptible to such interpretation."  (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

We conclude that the court properly instructed the jury on the admissibility of CSAAS evidence with CALCRIM No. 1193.  The purpose of CSAAS evidence is to help the jury evaluate the credibility, i.e., the "believability," of an allegedly abused child's testimony.  (*McAlpin, supra*, 53 Cal.3d at p. 1300 [expert testimony on CSAAS "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident . . . is inconsistent with his or her testimony claiming molestation."]; *People v. Housley, supra*, 6 Cal.App.4th at p. 955 ["[E]xpert psychological testimony may be used to aid the jury's assessment of the victim's behavior.  [Citation.]"].)  Roa does not cite any authority for the proposition that instructing the jury on the permissible purposes for which it may consider evidence would be error.  Indeed, such a rule would make no sense because, in the case of evidence admitted for a limited purpose, that is the precise function of the instruction. (See Evid. Code, § 355.)

We likewise see no internal inconsistency between the portion of CALCRIM No. 1193 that directs the jury not to consider CSAAS evidence as "evidence that the defendant committed any of the crimes charged against (him/her)" and the portion that allows the jury to use CSAAS evidence "in evaluating the believability of [the alleged victim's] testimony."  The two portions correctly describe the impermissible and permissible applications, respectively, of CSAAS evidence.  There is nothing in the latter portion that would contradict the former, e.g., by instructing the jury to conclude that the

14

victim is credible if the child acts like a molestation victim, which would plainly be impermissible. (See *People v. Bowker, supra*, 203 Cal.App.3d at p. 393.) Roa's contention that the jury would be unable to understand and apply the instruction is unsupported speculation. "Jurors are routinely instructed to make . . . fine distinctions concerning the purposes for which evidence may be considered, and we ordinarily presume they are able to understand and follow such instructions." (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) Roa has provided "no reason to abandon the presumption in this case, where the relevant instructional language seems clear and easy to understand." (See *ibid.*)

Roa has not shown any error in the trial court's instruction, which fully and fairly instructed the jury on the use of CSAAS evidence in this instance. Because we hold there was no error in the court's instruction, we need not address Roa's arguments regarding the effect of the alleged error.

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

15