Filed 8/28/13  P. v. Regalado CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VICTOR TREVINO REGALADO,<br><br>    Defendant and Appellant. | F062666<br><br>(Super. Ct. No. F09907196)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Tiffany J. Gates, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Victor Trevino Regalado stands convicted, following a jury trial, of continuous sexual abuse of a child (Pen. Code,[1] § 288.5, subd. (a); count 1), commission of a lewd act on a child (§ 288, subd. (a); counts 3 & 6), aggravated sexual assault (sexual penetration) of a child (§ 269, subd. (a)(5); count 4), and aggravated sexual assault (rape) of a child (*id*., subd. (a)(1); count 7). The jury further found the offenses in counts 3, 4, 6, and 7 involved substantial sexual conduct with a victim under age 14 (§ 1203.066, subd. (a)(8)).[2] Sentenced to a total unstayed term of 12 years plus 30 years to life in prison and ordered to pay various fees, fines and assessments, defendant now appeals, claiming instructional error and related ineffective assistance of counsel. We affirm.

## FACTS

## I

### PROSECUTION EVIDENCE

T. was born in 1993.[3] Defendant, her stepfather, began touching her breasts and private areas when she was six years old. On one occasion during this time period, when she lived on Fairbanks, in Sanger, with a number of family members, just she and defendant were lying on the bed in the room they all shared. Defendant touched her on her breast and made her suck his breasts. Defendant touched T. more than three times during this time period. After he touched her, he would buy her ice cream or take her shopping.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] The jury acquitted defendant of committing a lewd act on a child (§ 288, subd. (a)) as charged in count 5. As count 2, which also alleged a violation of section 288, subdivision (a), was charged in the alternative to count 1, the trial court found defendant not guilty by operation of law.

[3] In keeping with rules of protective nondisclosure, we refer to certain persons by their first names or initials. No disrespect is intended.

Tina, defendant's niece, recalled that in the summer when she was nine and T. six, T. said her dad (which was how she thought of defendant) made her do things. When Tina asked what kind of things, T. said he would make her touch him and he would do the same thing back to her. T. said these things usually happened when L., her mother, was not around.

Tina did not believe T. at first, because it did not seem to her that defendant was capable of doing something like that. A day or so after their conversation, T. and Tina were in T.'s room, which was part of her parents' bedroom but with the sleep areas separated by an entertainment center. T. said, "Watch, I'll show you." She told Tina to hide where Tina could see them, so Tina lay on the floor behind the entertainment center. Tina saw T. go up to defendant, who whispered to T. to get into the bed and opened up the blankets for her. They got under the blankets, and it looked to Tina like defendant got on top of T. There was movement that did not seem normal for a father and daughter. Tina made a noise so defendant knew someone else was in the room. This interrupted the movement under the covers, and defendant told T. to go play. Tina and T. left the room together; defendant saw Tina, but did not say anything to her. Afterward, T. told Tina, "I told you so."[4]

---

[4]     Tina was herself molested (not by defendant) beginning when she was around six, a fact she shared with T. around the time she learned T. was being molested. At some point during the investigation into T.'s allegations, Detective Cooney began leaving telephone messages for Tina. It took her months to return his calls, because she was not ready to talk about her own molestation. When she finally spoke to Cooney around March 22, 2010, she did not tell him about the entertainment center episode, because she did not remember it at the time.

T. likewise did not recall the incident until shortly before trial, when she was talking to Tina and Tina asked if she remembered. T. said no at the time, but got to thinking about it and it all came back. At the time of the entertainment center incident, T. believed defendant was her biological father.

At some point, the house in Sanger burned down. In second grade, T. went to live with her great-grandmother in Pinedale. She had to repeat second grade, then, when she was in third grade, she moved back in with defendant and her mother because she missed her younger brother. This was in about 2002; they lived in the Whispering Woods apartment complex. During this time, when T.'s mother was not home and her brother was outside, defendant would call T. into the room. He would touch her vaginal area and breasts and buttocks, rub on her, and suck her fingers to show her how to do it. He would make her touch his penis with her hand and orally copulate him. He would also try to force his fingers inside her vagina. Sometimes T. would stiffen her legs so that he could not open them, but other times he was able to penetrate her with his fingers. These things happened once or twice a week while they lived at Whispering Woods.

The summer before seventh grade, when T. was 13, defendant began to attempt to have intercourse with her. He would lie on top of her and try to push his penis into her vagina. It hurt "a lot," and at first he only got the tip in. Later, he was able to fully penetrate her. Defendant did this three or four times during the summer.

On one occasion around the holidays, defendant told T. they were going to go shopping for Christmas presents. Instead, they went to a hotel, where they stayed for an hour or two.[5] When they were inside their room, defendant turned on the television and lay on the bed. He called T. over and tried to take off her pants. She tried to get away, but her pants came off. At the same time, he removed his pants and pulled her underwear to the side. He took out his penis and tried to insert it in her vagina. He got on top of her and was able to achieve penetration. T. punched him in the chest and was able to get away. She grabbed her clothes and went into the bathroom. When she came out, they

---

[5]    T. initially was adamant this occurred in 2007. After having her memory refreshed concerning when she first spoke to a detective, however, she concluded it happened in 2006. She denied it took place in 2005.

left and went shopping, and defendant bought T. a wallet. T. believed it was just starting to get dark when they left the hotel.

Jacquelyn A. became friends with T. in fifth grade. One day, during the first couple months of their seventh grade school year, they were discussing television shows about young girls, and T. said she had been raped before. When Jacquelyn asked who did it, T. said her stepdad. Jacquelyn did not pursue the conversation at that time, but later asked T. about it and whether it was true. T. said yes. Over the course of their conversations, T. revealed she and defendant had had sexual intercourse and he would have her masturbate him. T. said it had been going on for a while.

P.M., who was only a few years older than T., was T.'s aunt. She recalled T. and her family living at the Whispering Woods apartment complex in Fresno. During that time, T. related on a couple of occasions that defendant tried to have sex with her. As T. grew older, she told P.M. that defendant was in fact having sex with her. Over the years, T. told P.M. 10 to 15 times that defendant was molesting her or having sex with her. Almost every time, P.M. encouraged her to tell someone or offered to do it for her. T. refused and said she was scared. P.M. believed T. told her these things a couple of times before 2006, but repeatedly between 2006 and 2009. At one point, T. said defendant had taken her to a motel "and had her do it there," and then he took her home. P.M. could not remember how old she and T. were at the time of this conversation, but she recalled it was during the season when the fair comes to Fresno.

Laura Dassori had been friends with defendant and his sister and parents for years. She subsequently became best friends with L., defendant's wife, and the couple rented a house Dassori owned. Dassori became close to T., with whom she developed a big sister/aunt type of relationship. Dassori left the area in November 2006, but continued to maintain close contact with the family.

5.

In March or April of 2007, during the time defendant was in jail, L. telephoned, crying, and said P.M. had found a journal in the closet.[6] L. read Dassori parts of the journal. In one excerpt, T. wrote about a time defendant forced her to orally copulate him. L. was crying and distraught and did not know what to do. Dassori advised her to call the police and speak to T. right away.

L. called Dassori later that night or the next day, and said she talked to T., who said it did not happen.[7] Dassori, who was a police dispatcher at the time, explained that it was common for victims to recant, and suggested she (Dassori) or someone else should talk to T., because maybe T. did not feel comfortable. L. said that under no circumstances was Dassori allowed to talk to T. about it. Dassori agreed she would not do so until defendant got out of jail, as L. said T. would need time to process it.

After that, things went on pretty much normally. Dassori kept her promise. At one point, L. got defendant out of jail for the day so he could attend T.'s First Communion.[8] The ceremony was at a church, followed by a party at the house. Dassori noticed that T. tried to stay away from defendant.

In June, defendant was released from jail. Dassori invited T. to stay with her in Corona for the summer, and L. agreed. After a few days, when T. had gotten comfortable, Dassori asked T. if defendant ever touched her. T.'s eyes teared up and she

---

[6] Defendant was arrested on January 25, 2007, for possession of methamphetamine.

[7] According to T., when she was in ninth grade, she wrote in her journal about everything that was happening and what defendant was doing to her. When L. asked her if what was in the journal was true, T. nodded her head yes. L. just hugged her and walked away.

[8] According to T., L. asked T. to write a letter to the judge, asking if defendant could come out for her First Communion. T. knew it was not a good idea, but she did it because she knew L. wanted it. The communion took place on April 28, 2007. T. never told Detective Cooney or the prosecutor about the letter because she forgot about it.

nodded affirmatively. Dassori called the Corona police, who referred her to the Fresno police.

On June 20, 2007, Fresno Police Detective Kobashi contacted Dassori, and set up an appointment for June 25 to talk to T. Dassori and T. came up to Fresno, and Dassori decided to tell L., thinking she would want to be there for her daughter during a difficult time. Dassori left T. with Anna, one of T.'s aunts, and went to pick up L. As they neared Anna's house, Dassori told L. that T. had confided to her that defendant had been molesting her and had raped her. L. was quiet until Dassori stopped the car, then she got out and started yelling that Dassori had ruined her family and it was not Dassori's business. L. yelled that T. was lying.

Dassori told L. that she wanted to take T. to the interview with the detective. When L. refused, Dassori called 911 and requested officers at the scene. A patrol officer who responded to the disturbance call notified Kobashi. When she arrived, L. told Dassori that she did not want T. to talk to Kobashi at Kobashi's office downtown. L. was upset with Dassori, and the two were arguing about T., who was also upset and crying. Dassori was asking L. why she was protecting her husband instead of her daughter, and L. was asking why Dassori was messing up L.'s life and saying T. was a liar and was making it all up.

T. agreed to go down the block a short distance to talk to Kobashi. During the conversation, T. first looked down and did not answer, then admitted she had been molested by defendant. T. started crying while she was talking, and she said defendant had told her not to tell. She said the last time defendant touched her was in January 2007, just before he went to jail.

T. agreed to come to Kobashi's office to talk, and also said it would be all right to tell her mother what T. had told Kobashi. Kobashi brought L. to T.'s location and told her what T. had said. L. looked angry and kind of shook her head. She stood staring at

7.

T. with her arms crossed.  However, she agreed to bring T. to Kobashi's office the next day.

Kobashi was ill the next day.  When she returned to work the day after that, she telephoned L. to reschedule the interview, but received no answer.  She left three or four messages before L. called her back.  L. said she had taken T. out of town for the Fourth of July weekend, and would call when they returned.  L. did not do so, despite Kobashi leaving two more messages for her.  On July 6, Kobashi and Detective Fuentes went to L.'s house.  L. said T. was sleeping and did not want to talk to Kobashi, but eventually she let them in.  L. said she had not returned Kobashi's calls because she was busy looking for new living quarters, as Dassori owned the home and was evicting them.

Kobashi and Fuentes went with T. into another room so they could speak in private.  Most of the time, T. looked down at the ground rather than at Kobashi, and simply nodded yes or no in answer to Kobashi's questions.  When Kobashi asked T. if it was true that T. did not want to talk to Kobashi, T. nodded affirmatively.  When Kobashi asked if what T. had told her the other day was a lie, T. just put her head down and looked at the ground, then nodded affirmatively.  Kobashi asked if T. would come to her office and talk to her, whereupon T. shook her head no.  Kobashi then asked if T. felt she would be safe if defendant (who had left the week before at L.'s request) came back into the house, and T. again shook her head no.[9]

Kobashi subsequently tried to contact defendant, and was finally able to interview him on July 24, 2007.  Defendant described T., who was 13 at the time, as "a good kid," but said he was strict with her.  Defendant said he had learned of the allegations against him the day of the disturbance between L. and Dassori; he said Dassori was like a sister

_____

[9]     According to T., she refused to proceed with Kobashi because L. scared her.  L. looked at her "evil," in a way that indicated T. was not supposed to talk and L. would do something if T. did.  This was a feeling T. got; L. never actually gave her any instructions.

to him and he did not know why she would make such allegations against him. When Kobashi said T. was making the allegations, not Dassori, defendant just nodded. He said he would admit to doing it to take away the pain from T., and he offered to plead to the charges if it would make it easier for T. to not have to go through this. Kobashi said she did not want him to admit to something if it was not true, and that she wanted him to tell her the truth. She then asked him if T. was lying. At first, he said he did not know. Kobashi then was specific with him about what T. had said. This time when she asked if T. was lying about that, defendant said yes, she was lying about that.

At some point after the interview with defendant, the case was suspended. There was not enough evidence to proceed. Meanwhile, T. and L. moved to T.'s great-grandmother's house in Pinedale, while defendant and T.'s brother moved to Sanger. At some point, the family ended up in the same house together, in Sanger, because T. wanted to see her brother.

T. completed her freshman year in high school in Sanger, but spent as little time as possible at home. That summer, she got into trouble for getting two tattoos. As a result, she was grounded for the summer. Not long after, her brother put a live spider in her hair. She cornered him and pretended to hit him. He was laughing, but L. pulled her away, yelled at her, and tried to slap her face but missed and hit her arm instead. When L. followed T. outside and continued yelling at her, T. left.

On August 19, 2009, T. telephoned Dassori. She was very upset after a disagreement with her mother, and said there had been physical violence and she had left the house. T. said she could not take it anymore and could not continue to live there. She asked if she could live with Dassori, and Dassori agreed and arranged for her to get to Southern California, where Dassori lived. T. was put into foster care while a background check was run on Dassori, then Dassori was named T.'s guardian and T. came to live with her around September 14, 2009.

9.

In November, Dassori asked T. what really happened, why she recanted, and if she wanted to proceed. T. said she did want to proceed, so Dassori contacted the Fresno Police Department and spoke to Detective Cooney. Dassori brought T. up to Fresno, and they met with Cooney and gave statements on November 27, 2009. During the interview, Cooney asked T. about the 2007 investigation. T. related that L. had instructed her to lie to the police, and that, since moving in with Dassori, she had started to build some strength and wanted to make a formal report.

T. related to Cooney that her first memories of being sexually assaulted by defendant occurred when she was six to seven years old. Defendant would come into her room and start to rub on the outside of her vagina and her breasts and buttocks, and he would have her suck on his fingers. T. said this occurred about once a week from the time she was six or seven, up until about her eighth birthday. T. said defendant would take her out for ice cream and shopping after these incidents. T. said that when she was around eight years old, she went to live with her grandmother and the assaults stopped.

T. told Cooney that when she was nine years old, she again resided with defendant, and the assaults resumed and became more physical. Defendant would get in bed with her. He would have her undress and he would also undress. Defendant would lie on top of her, naked, and kiss her neck, fondle her breasts, and rub her vagina. She recalled him trying to insert two fingers into her vagina. She would wiggle and squirm in an attempt to prevent the activity from occurring, but she was not always successful and she was digitally penetrated. T. said these incidents were as frequent as one to three times a week, and occurred from when she was nine until she was 11 to 12 years old.

T. reported that when she was 12 years old, the assaults escalated. She would be alone with defendant in a room, and he would try to insert his penis into her vagina. She recalled three to four such incidents occurring within a one-month period during the summer she was in sixth grade. She said defendant managed to insert the tip of his penis, and that it caused her pain.

10.

T. related that somewhere around Thanksgiving or Christmas of 2005, defendant took her to a Motel 6 near Blackstone and Ashlan, in Fresno, and sexually assaulted her. She said that once they got to the motel room, defendant undressed her and then himself. She lay on the bed, and he climbed on top and inserted his penis into her vagina. This caused her pain, and she attempted to scoot away from him. She punched him in the chest, grabbed her clothing, and went into the bathroom. When she came out, he took her to a nearby store and bought her a wallet.

Cooney subsequently obtained a receipt from the motel. The receipt showed a check-in date of November 17, 2005, and a checkout date of November 18, 2005. The address provided for defendant was the Whispering Woods apartment complex in Fresno. The receipt did not give a checkout time, but showed defendant received a full refund. This suggested to Cooney the stay might have been a short one.[10]

T. admitted at trial that the summer of 2009, when she ran away, was a bad time in her life. She was spray-painting graffiti, staying out all night, and drinking. She was also hanging out with some bad people. When she went to live with Dassori, she straightened out and stopped tagging and drinking. She refused to leave her boyfriend, however, which was what Dassori wanted because he was controlling and used drugs. In November 2010, she and Dassori argued about him, and T. ultimately ended up back in Fresno. T. also admitted that on November 16, 2009, she had a conversation with a social worker in which she said she recanted her story in 2007 because she did not want her brother to be taken away and put in a foster home. In 2010, however, she told the

---

**10**     Cooney subsequently obtained two other receipts for stays by defendant at a Motel 6 in Fresno. This Motel 6 was about an eighth of a mile north of the other Motel 6. The dates of the stays were February 19, 2006, and April 12, 2006. These receipts did not list a checkout date. T. never said she had been taken to a Motel 6 three times. She never told Cooney that Tina was an eyewitness to misconduct by defendant.

11.

district attorney's investigator that she moved to Sanger in 2008 because she was afraid defendant was going to start molesting her brother.

Psychologist Randall Robinson testified concerning Child Sexual Abuse Accommodation Syndrome (CSAAS). Robinson would expect a child who reported abuse and was met with a great amount of upset from the family to retract. Moreover, CSAAS explains why reporting, if there is any, tend to be inconsistent. Because children want to have a family and to believe they are loved, it would not be unusual for the child to go to family gatherings or continue to have a relationship with the abuser.

## II

### DEFENSE EVIDENCE

Anna lived with L. and defendant for a little more than a year in 2008, when they lived in Sanger. T. told Anna she came to live in Sanger because she did not like the Fresno schools and was having "girls' problems." Anna was aware T. had made accusations against defendant in 2007, but did not ask her why she was moving in with defendant. T. said nothing about being afraid defendant would molest his own son. At no time did T. tell Anna that defendant had been molesting her, although during the disturbance at Anna's house on June 25, 2007, T. said she had been molested. From what Anna observed, T. was not mistreated during the time they both lived in Sanger.

Rosita Regalado was defendant's mother. When defendant and L. and the children lived with her in the house on Fairbanks in Sanger, before it burned down, L. did not work. Regalado saw nothing suspicious involving defendant and T. T. was always in L.'s presence.

L. married defendant in 2005, after they had been together for several years. T.'s younger brother was defendant's son. At a number of places in which they lived, multiple other family members lived with them. Before his arrest in this case, defendant was always very heavy, perhaps 280 to 300 pounds. During the time they lived at the

12.

Whispering Woods, L. injected defendant in the stomach twice daily with diabetes medication. This caused defendant always to have lumpy bruises on his stomach.[11]

Around the end of 2004 or beginning of 2005, L. learned defendant was using drugs, and she confronted him. During this time, defendant did not sleep at home. T. was present when L. and defendant had heated arguments concerning the situation.

In May 2007, P.M. gave L. a piece of paper on which T. had written she was being molested. After telephoning Dassori (who did not counsel her to call the police), L. confronted T. and cried and begged to know the truth, and said that if anybody had done something to her, L. would put them in jail. If it was defendant, who was in jail at the time, L. promised he would stay in there. She asked T. if anything had happened, and T. said no. L. hugged her and said she loved her, and left it at that. Later, when T. went to visit Dassori and Dassori called the police, L. was upset with Dassori. L. and Dassori were arguing when Kobashi arrived. L. never told T. to retract what she told Kobashi or gave her "the evil eye." It was T. who did not want L. to contact Kobashi. T. said she had told Kobashi originally that she was molested because Dassori kept on her and on her, and she just wanted Dassori to shut up and leave her alone.

When the time approached for T.'s First Communion, L., T., and T.'s brother were visiting defendant in jail and the subject came up. When they all told defendant they wished he could be there, another visitor said that if they wrote letters to the judge, the judge might let defendant out on an eight-hour furlough. L. and T. decided to write the letters. T. said she wanted defendant to be able to come out, because he made the best barbecue and she wanted barbecue.

In September 2008, T. was attending Fresno High School. She had a problem at school and did not want to be there anymore. L. suggested a transfer to Bullard, but T.

---

[11] According to Cooney, T. never described defendant as having any sort of unusual condition on his stomach.

did not want to go there or to Clovis schools, in which district L.'s grandmother lived. T. said it would be easier for her to go to Sanger High because defendant and L. already had a house in Sanger. As a result, defendant enrolled her at Sanger High, and T. moved to Sanger. L. was aware Kobashi had said T. and defendant needed to live apart, but T. wanted to go to Sanger, so L. let her. T. never told L. she was worried defendant would molest her brother or why she withdrew the accusations she made in 2007. After T. withdrew the accusations, L. treated her the same as always.

During the incident in which T.'s brother put a spider on her head, L. heard the commotion and found them fighting. They were not laughing or pretending. L. broke it up and pushed them both back, and T. yelled that L. was always taking her brother's side. L. did not hit T., but did accidentally scratch her arm when she grabbed it because T. was trying to leave. T. went outside to cool off, and L. sent her son to his room. When L. went outside, T. ran away. L. and T.'s uncle looked for her, but did not find her. L. subsequently called the Sanger police.

Psychiatrist Avak Howsepian testified concerning recovered memory. Repressed or recovered memory refers to a traumatic or disturbing event that was witnessed or experienced, which then becomes repressed (unavailable in some ways to consciousness), and then at some later time is uncovered, either spontaneously or by some triggering experience or therapy. Howsepian explained there is controversy about the theory because, in the vast majority of cases, individuals tend to remember traumatic events all too well. In addition, false memories can be implanted by way of suggestion, by therapists or by people such as friends or detectives. There are also individuals who, without anyone suggesting anything to them, claim to believe things that never happened.

Howsepian also testified about CSAAS. He explained it is a pattern of behavioral and emotional responses that is sometimes seen in children following sexual abuse. The individual is secretive, tends to feel helpless, feels entrapped in the situation, accommodates the abuser, and discloses information in a delayed or inconsistent way or

14.

even denies the abuse took place. The purpose of CSAAS is to help therapists deal with patients, and to demystify children's behavior in the law enforcement context. CSAAS is not diagnostic; these features of a child's behavior and emotional expression should not be used to conclude an individual was or was not sexually abused.

## DISCUSSION

Evidence was admitted at trial, under the fresh complaint doctrine, of out-of-court statements T. made to Dassori, Tina, Jacquelyn, P.M., and Detective Kobashi, concerning things defendant did to her.[12] In addition, evidence was presented of prior consistent and inconsistent statements made by T. (for example, to Detective Cooney) and other witnesses. Pursuant to CALCRIM No. 318, jurors subsequently were instructed:

> "You may have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways. 1, to evaluate whether the witness' testimony in court is believable and, 2, as evidence that the information in those earlier statements is true."

Despite his lack of objection to the instruction at trial, defendant now contends CALCRIM No. 318 incorrectly stated the law concerning evidence admitted under the fresh complaint doctrine, and says the error violated his rights to due process and a fair trial. The Attorney General says the claim has been forfeited, and that any error was harmless in any event. We find no cause for reversal.

"[U]nder principles generally applicable to the determination of evidentiary relevance and admissibility, proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose — namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others — whenever the fact that the

---

[12]    Defendant objected, pursuant to Evidence Code section 352 and on due process grounds, to the number of fresh complaint witnesses. He also raised a hearsay objection and argued the admission of explicit detail would go beyond the fresh complaint doctrine.

disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750, italics omitted.) The evidence is admissible only "for the limited purpose of showing that a complaint was made by the victim, and not for the truth of the matter stated. [Citation.] Evidence admitted pursuant to this doctrine may be considered by the trier of fact for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime. [Citation.]" (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522.)

The unmodified version of CALCRIM No. 318 given in the present case did not inform jurors of the limited purpose for which fresh complaint evidence may be used. Defendant does not contend, however, that the instruction incorrectly stated the law with respect to prior statements in general.**13** (See Evid. Code, §§ 770, 791, 1235, 1236; cf. *People v. Friend* (2009) 47 Cal.4th 1, 41-42 & fn. 23 [discussing CALJIC No. 2.13, the counterpart of CALCRIM No. 318].)

"A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. [Citation.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1024; compare *People v. Lawrence* (2009) 177 Cal.App.4th 547, 553-554, fn. 11 [properly read, defendant's argument went beyond claim challenged instructions were merely incomplete and instead asserted they were not "'correct in law'"].) Moreover, although a defendant "is deemed to have objected to instructions actually given [citation], generally he cannot claim that limiting instructions were wrongly

---

**13** Indeed, during the jury instruction conference, defense counsel made sure the trial court was going to include in the instruction both ways in which such statements could be used.

omitted unless his proffer of such instructions was rejected. [Citations.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 928, fn. 23, italics omitted.)

Here, defendant never sought clarification of CALCRIM No. 318 as it applied to fresh complaint evidence, nor did he request any sort of limiting instruction. Accordingly, he has forfeited any assignment of error. (*People v. Sully* (1991) 53 Cal.3d 1195, 1218.)[14]

Defendant appears to contend the trial court had a sua sponte duty to instruct on the limited purpose of fresh complaint evidence. It is true that "[a] trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 517.) However, "[w]hile the court has the obligation to instruct on general legal principles so central to the determination of guilt or innocence that to ensure a fair trial they must be explained to the jury [citation], it is not incumbent upon the trial court to instruct on specific points developed at trial. [Citation.]" (*People v. Daya* (1994) 29 Cal.App.4th 697, 714.)

"When evidence is admissible … for one purpose and is inadmissible … for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355, italics added.) "Trial courts generally have no duty to instruct on the limited admissibility of evidence in the absence of a request. [Citation.]" (*People v. Lang, supra,* 49 Cal.3d at p. 1020; see, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1134; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1316 & cases cited.) This is so even when the issue concerns the limited purpose for which fresh complaint evidence was admitted (*People v. Manning* (2008) 165

---

**14** The forfeiture rule applies to claimed violations of fundamental constitutional rights as well as to asserted state law errors. (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 465.)

Cal.App.4th 870, 880), as an instruction on this subject has historically been viewed as a limiting instruction, not an instruction falling within a trial court's duty to give on its own motion (see, e.g., *People v. Brown, supra,* 8 Cal.4th at p. 757; *People v. Clark* (1987) 193 Cal.App.3d 178, 182-183, abrogated on another ground in *People v. Brown*, *supra*, at pp. 756-757, 762-763). Although the California Supreme Court has left open the possibility a duty to instruct on the limited admissibility of evidence even absent a request "might be found to exist in 'an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose'" (*People v. Lang, supra,* 49 Cal.3d at p. 1020), this is manifestly not such a case.

In light of the foregoing, whether we consider the claim of error forfeited by defendant's failure to object to or request modification of CALCRIM No. 318 (see *People v. Welch* (1999) 20 Cal.4th 701, 757) or conclude no instructional error occurred because the trial court violated no sua sponte duty on its part (see *People v. Riccardi* (2012) 54 Cal.4th 758, 824-825; *People v. Boyer* (2006) 38 Cal.4th 412, 465; *People v. Manning, supra,* 165 Cal.App.4th at p. 880), defendant's contention fails.

Even if we were to find section 1259 applies, the ultimate result would be the same. That statute provides, in pertinent part: "The appellate court may … review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." With respect to this statute, "'[t]he cases equate "substantial rights" with reversible error' under the test stated in *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)]. [Citation.]" (*People v. Felix* (2008) 160 Cal.App.4th 849, 857; accord, *People v. Lawrence, supra,* 177 Cal.App.4th at pp. 553-554, fn. 11.)

Here, it is not reasonably probable a different result would have been reached had the trial court given a limiting instruction with respect to the fresh complaint evidence.

18.

(See *Watson*, *supra*, 46 Cal.2d at p. 836.) Defendant says that whether T. actually made the disclosures that were admitted under the fresh complaint doctrine when she was younger, or merely got the various witnesses to say she made those disclosures at an earlier time, "was a significant issue at trial." However, "[T.] testified at trial, and the jury did not have to rely on her secondhand statements to other people, but was able to hear her directly and judge her credibility. Her fresh complaint statements were consistent with and cumulative to her trial testimony. [Citation.]" (*People v. Manning, supra,* 165 Cal.App.4th at pp. 880-881.) Likewise, those to whom T. made the disclosures also testified and were extensively cross-examined on the subject, as well as, in Tina's case, whether she truly had been a percipient witness to defendant molesting T. when she and T. were young, or whether the entertainment center incident was a latter-day concoction. Under the circumstances, any instructional error was harmless. (*Id*. at p. 881.)

Defendant says CALCRIM No. 318 violated his due process rights and so prejudice must be assessed under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. In order for a constitutional violation to be shown, however, it is not enough to establish that an instruction was erroneous. Rather, the question "is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [Citations.]" (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) The unmodified version of CALCRIM No. 318 given here did not render defendant's trial unfair. Any error is properly assessed under the *Watson* standard. (See *People v. Gamache* (2010) 48 Cal.4th 347, 376; *People v. Prieto* (2003) 30 Cal.4th 226, 248-249.)[15]

---

[15] Since defendant suffered no prejudice, any omission on defense counsel's part does not support a claim of ineffective assistance of counsel. (*People v. Coddington* (2000) 23 Cal.4th 529, 603, fn. 32, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Were we to analyze defendant's assertion

19.

## **DISPOSITION**

The judgment is affirmed.

_____

DETJEN, J.

WE CONCUR:

_____

GOMES, Acting P.J.

_____

KANE, J.

---

of incompetent counsel, we would find no prejudice under the standard applicable to such a claim.  (See *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008-1010 & fn. 3.)