Filed 4/30/15  P. v. Grey CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ANTUON EUGENE GREY, <br><br> Defendant and Appellant. | D065038 <br><br><br> (Super. Ct. No. SCD240243) |

APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Antuon Eugene Grey guilty of murdering Edwin Jackson, attempting to murder Dave Lockett and assaulting Lockett with a firearm.  It also found true a

number of firearm, gang, and great bodily injury allegations. The court subsequently found Grey had a valid strike and prison prior. Grey received a total prison term of 19 years, plus 100 years to life. Although codefendant Deandre Grey, Grey's brother, was tried on the above charges, the prosecution elected to dismiss all of the charges against him due to insufficient evidence.

Grey appeals, contending the trial court prejudicially erred (1) by removing a juror during the trial and (2) in refusing his request to instruct the jury to view eyewitness testimony with caution. We reject his contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 20, 2012, Hopeton Bennett, a member of the Parkside/Skyline gang known as "Baby Dos," was shot and killed, and Parkside/Skyline gang member Julian Velasquez was shot. Grey was also a member of the Parkside/Skyline gang and was known as "Little Dos." The naming arrangement between Grey and Bennett indicated that Grey was something of a mentor to Bennett.

The following day, Lockett was visiting some family members at an apartment complex on Solola Avenue in San Diego. While in the parking lot, Lockett ran into an acquaintance, Jackson, who lived at the complex. Jackson was a member of the Lincoln Park gang, the chief rival of Parkside/Skyline gang. The Lincoln Park gang was known to occupy the apartment complex on Solola Avenue.

As Lockett started back to his relative's apartment, he saw two black males, one of whom he later identified as Grey, approaching from the parking lot entrance. Another witness heard Jackson ask the men, "Blood, who is you niggers?" After a

2

brief exchange, Grey pulled a firearm from his sweatshirt pocket and fired the weapon, striking Lockett in the stomach as Lockett dove to the ground. Lockett then heard running footsteps and multiple gunshots. A number of these shots struck Jackson, who died from his injuries. Police recovered a beanie hat from the scene with DNA analysis producing a match to Grey's brother.

Later that day, Lockett gave a description of the shooter to police, noting that the shooter had a lot of acne on his face. Lockett, however, did not get a look at the face of Grey's companion. As a result of the DNA match, police went to the residence of Grey's brother where they encountered and photographed Grey, who had distinctive acne on his face and appeared to fit the general description of the shooter. Police recovered from the residence a pamphlet for Bennett's funeral memorial.

Police later conducted an audio-recorded photographic lineup with Lockett. Lockett selected Grey's photograph out of a five-photograph lineup and identified him as the shooter. The detective, however, forgot to have Lockett sign the photograph. The following day, police conducted another audio-recorded photographic lineup with Lockett. Lockett again identified Grey's photograph as the shooter and signed the photograph. Lockett testified at trial he had no doubt and was "100 percent" sure Grey was the shooter.

A gang expert testified regarding gangs and gang culture, including that acts of violence between rival gangs result in violent retaliation. Based on a hypothetical mirroring the prosecution's evidence, including the shooting death of Bennett

3

approximately 30 hours earlier, the gang expert opined that the shooting in this case was committed for the benefit of the Parkside/Skyline gang.

DISCUSSION

I. *Removal of Juror*

A. Background Facts

After the prosecution rested its case, the defense called as its second witness an eyewitness identification expert, Dr. Roy Malpass. Although currently retired, Dr. Malpass was previously a professor at a number of universities, including the University of Texas at El Paso.

Dr. Malpass has qualified as an expert in courts throughout the United States, and also participated in some national studies. During his career in academia, Dr. Malpass conducted experiments regarding eyewitness identification, including one study which demonstrated that if witnesses are given an unbiased instruction stating that the suspect may or may not be present in a lineup at the time they are shown the lineup, the false positive identification rate decreases. Dr. Malpass testified that studies performed by some other researchers in his field show that while there is a small correlation between the confidence an eyewitness has in his or her identification and the accuracy of the identification, the correlation is not strong.

With respect to the specific lineup used in this case, Dr. Malpass observed that the photographic lineup contains only five photographs, whereas the prevailing consensus throughout the United States including at the Department of Justice is that six photographs should be used. In addition, two of the nonsuspect "filler" photographs

4

included in the lineup were different than Grey's photograph in terms of skin color and facial hair. He concluded that the lineup was biased against Grey.

Dr. Malpass noted that a double-blind procedure, where the law enforcement officer administering the lineup does not know the identity of the suspect, was not used in this case. He commented that because the police placed Grey's photograph as the last one in the sequential lineup, a witness might feel extra pressure to identify a suspect when reaching the last photograph. He also noted that research showed that when witnesses are placed in stressful situations or situations involving more than one suspect, their ability to make accurate identifications decreases.

During a break in Dr. Malpass's testimony on direct examination, Juror Number 8 (the Juror) asked to speak to the court. The following colloquy then occurred:

> "The Court: We're in my office with the two attorneys, the reporter, and [the Juror]. Yes, sir. Go ahead. Tell us what your concerns are.
>
> "[The Juror]: The last witness stated that he was a professor at the University of Texas at El Paso, and I believe I am now a biased juror because of that, because I actually attended the University of Texas at El Paso as a student, and I was a participant in some of the psychological studies that were discussed.
>
> "The Court: Do you recognize him?
>
> "[The Juror]: I do not recognize him. I do not recognize his name, but my fear is that the atmosphere of the researchers that he was a part of influenced me in the past, and it has helped me form an opinion, you know, that is biased in the favor of the defense.
>
> "The Court: Okay. Let's see. [Defense counsel], do you have any questions you would like to ask the juror?
>
> "[Defense Counsel]: So what do you mean by biased?

"[The Juror]: I feel like I have already formed an opinion of the -- once the prosecutor rested, I felt I already formed a good solid opinion, and unless something else changed, then I almost knew which way I was going to cast my ballot for. But now that this witness has come up, I kind of feel guilty. I feel that I would feel guilty voting in that particular way. I'm not sure if it's appropriate to discuss how I would find the case.

"The Court: No. I think we probably can infer it from what you said. I don't know that we need to go into that. Let me ask you this: When were you there and participating in those studies?

"[The Juror]: Well, there was two periods when I was a student at the University of El Paso. I was a student between 1999 and 2000, also from 2006 to 2009, and it was during 1999 and 2000 when I participated in a psychological -- psychology class, Introduction to Psychology. And part of the curriculum of that class was essays. And in lieu of writing an essay, you can participate in psychological studies, and I participated in a number of those, including studies that involved eyewitness identification.

"The Court: Okay. You will only -- bias means that you can't be fair anymore. It doesn't mean you have a difference in evidence, and you have to resolve that. Do you think that you are so biased, really, against the prosecutor now?

"[The Juror]: I believe so. I would feel very bad if I was forced to render a verdict. I'd constantly be questioning myself whether or not I made the right decision.

"The Court: [Defense counsel], any other questions?

"[Defense Counsel]: No thanks.

"The Court: Mr. Prosecutor, any questions?

"[The Prosecutor]: No.

"The Court: Thank you for your candor. But you don't recognize the professor?

"[The Juror]: I do not recognize the professor.

6

"The Court: Did you go through the types of studies he describes where something happens?

"[The Juror]: Yes. And followed up after on it. Afterwards, followed up on the studies. And, like, in the years I followed it, I heard stuff, you know, say, like, reports that had -- that were related to those studies, and it would pique my curiosity because of my involvement on them. I would read up on the reports. I would read their findings that eyewitnesses were very unreliable, according to those studies, and so that influenced my development while I was -- from the late teenage years through my 20's, to form that opinion.

"The Court: Thanks. In view of my questions, any questions from the defense?

"[Defense Counsel]: No. Thanks.

"The Court: From the Prosecutor?

"[The Prosecutor]: No. Thank you.

"The Court: [Juror], why don't you go on out, and I'll talk to the attorneys in here. We'll be with you."

Outside of the presence of the Juror, the colloquy continued:

"The Court: The juror has left. What is the position of either side on this?

"[The Prosecutor]: It's our position that we excuse him and impanel an alternate or random alternate.

"The Court: [Defense counsel]?

"[Defense Counsel]: Well, you tell them to reserve judgment until they get into the deliberation room, and I think he's an example of how that oftentimes doesn't happen, unfortunately.

"The Court: I think in view of what he's saying, that I should excuse him. Do I do that with your -- over your objection?

"[Defense Counsel]: I'll submit, Your Honor.

7

"The Court: Very well.  I will go ahead and excuse [the Juror]."

B. Analysis

Grey complains the court's inquiry was too cursory and it failed to state specific reasons for removing the Juror.  Even assuming the court's inquiry was sufficient and the failure to state any specific reasons for removing the Juror should be excused, Grey contends his convictions should be reversed because there was no showing to a demonstrable reality of a disqualifying bias on behalf of the Juror.  Grey concedes defense counsel did not expressly object to the removal, but claims the issue is preserved for review as the court had a sua sponte duty to conduct an adequate inquiry, any objection would have been futile, we have the inherent authority to consider such constitutional issues on the merits absent any objection from defense counsel and he received ineffective assistance of counsel.

Penal Code section 1089 "authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.'"  (*People v. Bennett* (2009) 45 Cal.4th 577, 621.)  "A juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge."  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051.)  Removal of a juror under this statute is committed to the discretion of the trial court, and we review whether the grounds for such removal appear in the record as a "demonstrable reality."  (*People v. Thompson* (2010) 49 Cal.4th 79, 137.)  "The demonstrable reality test entails a more comprehensive and less deferential review.  It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the

8

entire record, supports its conclusion that bias was established." (*People v. Barnwell*, at pp. 1052-1053.) We do not reweigh the evidence but inquire whether the trial court's conclusion "is manifestly supported by evidence on which the court actually relied." (*Id.* at p. 1053.)

A trial court is in the best position to determine whether a potential juror is sincerely willing and able to listen to the evidence and the instructions, and render an impartial verdict based on that evidence and those instructions. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488-489.) "A reviewing court must allow the trial court to make this sort of determination. The trial court is present and able to observe the juror itself. It can judge the person's sincerity and actual state of mind far more reliably than an appellate court reviewing only a cold transcript." (*Ibid.*)

"The trial court retains discretion about what procedures to employ, including conducting a hearing or detailed inquiry, when determining whether to discharge a juror." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159.) The "manner in which the trial court conducted its inquiry [on a juror's fitness to serve] is subject to review for abuse of discretion under the typical standard." (*People v. Fuiava* (2012) 53 Cal.4th 622, 712, italics deleted.) For example, a trial court has the discretion to decide " 'a juror's disqualification is so clear that further [inquiry] is pointless . . . .' " (*Id.* at p. 714.)

As a threshold matter, by failing to object to the discharge of the Juror, Grey forfeited his claim that the trial court erred in excusing the Juror for cause. (*People v. Holt* (1997) 15 Cal.4th 619, 656.) We reject Grey's assertion that an objection would have been futile as unsupported by the record. (*People v. Hill* (1998) 17 Cal.4th 800, 820

9

[defendant will be excused from the necessity of a timely objection if objection would be futile].) After the prosecutor argued the Juror should be excused, defense counsel conceded the Juror's bias against the prosecution. The trial court stated its proposed ruling to remove the Juror and essentially invited defense counsel to state an objection. The trial court removed the Juror after defense counsel did not object to the court's proposed ruling. On this record, we cannot say an objection would have been futile. Even assuming Grey had preserved this claim on appeal, we conclude that the trial court did not err.

First, we find the trial court did not abuse its discretion in how it conducted its inquiry. After hearing the Juror's concerns, the trial court questioned the Juror and invited counsel to question the Juror. The court ended its inquiry after it and counsel had no further questions. With the benefit of hindsight, we might fault the court for failing to ask additional questions. But we cannot say that the trial court abused its discretion in how it conducted its inquiry. Additionally, as we shall discuss, the record shows the trial court properly excused the Juror based on bias against the prosecution.

"[A]ctual bias" is "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C); Pen. Code, § 1046 ["Trial juries for criminal actions are formed in the same manner as trial juries in civil actions."]; *People v. Hillhouse*, *supra*, 27 Cal.4th at p. 488.) Here, the Juror expressed concern he was biased against the prosecution, explaining that while he did not know Dr. Malpass, he attended

10

the university where Dr. Malpass taught, participated in some of the studies Dr. Malpass discussed, followed up on these studies for years by reading reports and had formed an opinion on eyewitness testimony in favor of the defense. The court told the Juror that bias did not mean resolving a difference in the evidence, but rather that he could no longer be fair. It then asked the Juror if he was biased against the prosecution. The Juror expressed his belief that he could not be fair and that he would "feel very bad" if forced to render a verdict.

The record shows the Juror's state of mind regarding eyewitness testimony made him biased against the prosecution and showed to a demonstrable reality the Juror could not be impartial. Accordingly, the trial court did not err by discharging the Juror. While Grey complains the trial court should have allowed the Juror to hear the remainder of Dr. Malpass's testimony before discharging the Juror, we fail to see how any additional testimony by Dr. Malpass would have changed the Juror's opinion based on the Juror's statement he had formed his opinion before Dr. Malpass testified and later felt guilty for doing so in light of Dr. Malpass's testimony.

## II. *Jury Instruction*

A. Background Facts

Defense counsel requested the trial court modify the instruction regarding the evaluation of eyewitness testimony, CALCRIM No. 315, in a variety of ways including adding language that "[y]ou must view eyewitness testimony with caution and evaluate it carefully." The trial court refused Grey's requested instruction addition, citing *People v. Wright* (1988) 45 Cal.3d 1126 (*Wright*) and *People v. Felix* (2008) 160 Cal.App.4th 849.

11

The trial court also noted it would instruct with CALCRIM No. 301, which cautions the jury to carefully review the testimony when a fact is proven by only one witness. The trial court ultimately instructed the jury with a modified version of CALCRIM No. 315 as follows (the modifications are italicized):

> "You have heard eyewitness testimony identifying the defendant. *Each of you alone must evaluate the credibility of the witnesses.* As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. *Consider the possibility that a witness made an honest but mistaken identification.*
>
> "In evaluating identification testimony, consider *all of the evidence, including but not limited to* the following questions:
>
> "• Did the witness know or have contact with the defendant before the event?
>
> "• How well could the witness see the perpetrator?
>
> "• What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance *between the witness and the perpetrator at the time of observation*, and duration of observation?
>
> "• How closely was the witness paying attention?
>
> "• Was the witness under stress when he or she made the observation?
>
> "• Did the witness give a description and how does that description compare to the defendant?
>
> "• How much time passed between the event and the time when the witness identified the defendant?
>
> "• Was the witness asked to pick the perpetrator out of a group?
>
> "• Did the witness ever fail to identify the defendant?

12

"• Did the witness ever change his or her mind about the identification?

"• How certain was the witness when he or she made an identification?

"• Are the witness and the defendant of different races?

"• Was the witness able to *accurately* identify other participants in the crime?

"• Was the witness able to identify the defendant in a photographic or physical lineup?

"• *What was the construction and presentation of the lineup shown to the witnesses?*

"• Were there any other circumstances affecting the witness's ability to make an accurate identification?

"The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

B. Analysis

A trial court is required to instruct a jury on the general principles of law that are relevant to the issues raised by the evidence in a given case. (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) A pinpoint instruction relates particular facts to a particular legal theory and "pinpoints" the crux of defendant's case. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) A trial court is required to give a pinpoint instruction when defendant requests it and there is evidence that supports the theory. (*Ibid.*) A court need not, however, give a pinpoint instruction that is argumentative or duplicative. (*People v. Harris* (2013) 57 Cal.4th 804, 853.) The failure to include a pinpoint instruction requires reversal if it is "reasonably probable that had the jury been given defendant's proposed pinpoint

13

instruction," it would have come to a different conclusion. (*People v. Earp* (1999) 20 Cal.4th 826, 887.)

Here, Grey asserts the trial court prejudicially erred in rejecting his requested instruction to view eyewitness identification evidence with caution. To the extent his proposed language could have been deemed argumentative or inappropriate, he asserts the trial court had a duty to craft appropriate language rather than reject his request outright. Grey concedes that our high court in *Wright*, *supra*, 45 Cal.3d 1126, rejected a similar instruction, but urges *Wright* is distinguishable on its facts, is not controlling and is out of step with more modern jurisprudence in both California and other jurisdictions throughout the United States. We disagree.

In *Wright*, the defendant requested the following instruction: " 'Where the prosecution has offered identification testimony, that is, the testimony of an eyewitness that he saw the defendant commit the act charged, such testimony should be received with caution. An identification by a stranger is not as trustworthy as an identification by an acquaintance. Mistaken identification is not uncommon, and careful scrutiny of such testimony is especially important.' " (*Wright*, *supra*, 45 Cal.3d at p. 1152, fn. 25.) Our high court concluded "this instruction was properly refused. [¶] No California case has held that such a cautionary instruction is required in addition to the eyewitness 'factors' instruction. . . . [¶] . . . [¶] . . . A special cautionary instruction is unnecessary because the 'factors' instruction already required properly highlights the factors relevant to defendant's concerns about the reliability of eyewitness identification testimony in a particular set of circumstances." (*Id.* at pp. 1152-1153.)

14

The Supreme Court further held that an additional "cautionary instruction given along with the factors instruction would place unwarranted emphasis on the eyewitness identification, and likely give the jury the improper impression that the *court* considers the eyewitness identification evidence not only particularly important but also overwhelmingly suspect." (*Wright*, *supra*, 45 Cal.3d at at p. 1153.) The court concluded "the eyewitness 'factors' instruction provides the jury with sufficient means to evaluate eyewitness identification testimony and alerts jurors to the factors that may affect eyewitness identifications. In addition, expert testimony may be used when appropriate to further elucidate the effect of the factors listed." (*Id*. at p. 1154.)

Grey argues his proposed instruction that a jury "must view eyewitness testimony with caution and evaluate it carefully" is different from the proposed instruction in *Wright*. (*Wright*, *supra*, 45 Cal.3d at p. 1152, fn. 25.) Grey is partially correct. The proposed instruction in *Wright* sought to inform the jury that "[m]istaken identification is not uncommon, and careful scrutiny of such testimony is especially important." (*Ibid.*) The *Wright* court found this usurped the role of the jury "as the exclusive trier of fact by binding it to the view that eyewitness identifications are often mistaken." (*Id.* at p. 1153.) While Grey's proposed instruction does not suffer from the same infirmity, this difference does not render our high court's other conclusions inapplicable.

CALJIC No. 2.92, the factors instruction discussed in *Wright*, is substantively indistinguishable from CALCRIM No. 315. (*Wright*, *supra*, 45 Cal.3d at pp. 1165-1166.) As the *Wright* court found, the factors instruction already highlighted issues relevant to the reliability of eyewitness identification and rendered a general cautionary instruction

15

unnecessary.  (*Id.* at p. 1153.)  We are obligated to follow *Wright* on this point.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Additionally, the trial court instructed with CALCRIM No. 301, which provided the following: "The testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully review all of the evidence."  We presume jurors follow the court's instructions and are able to understand and correlate the instructions.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

The *Wright* court also concluded a factors instruction, such as CALCRIM No. 315, provides proper guidance to the jury on the issues related to eyewitness identification and that any explanation of the effects of those factors should be "left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate."  (*Wright*, *supra*, 45 Cal.3d at p. 1143.)  Although Grey argues at length that recent studies demonstrate the inherent unreliability of eyewitness identification evidence, such studies simply underscore the *Wright* court's conclusion that *how* jurors should view eyewitness testimony is best addressed by expert testimony.

Finally, we reject Grey's suggestion that in *People v. Johnson* (1992) 3 Cal.4th 1183 (*Johnson*) our high court approved a "with caution" eyewitness instruction.  The issue in *Johnson*, was whether the modified version of CALJIC No. 2.92 given in that case, which included a cautionary instruction, was deficient in other specific areas raised by the defendant.  (*Johnson*, at pp. 1230-1234.)  The *Johnson* case did not address the court's prior holding in *Wright*.  Accordingly, we conclude the trial court did not err in refusing Grey's requested instruction.

16

DISPOSITION

The judgment is affirmed.

McINTYRE, J.

WE CONCUR:

NARES, Acting P. J.

McDONALD, J.

17