Filed 9/16/15  P. v. Romero CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B254685 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. GA023870) |
| RAUL ALCAZAR ROMERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Darrell Mavis, Judge.  Affirmed.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Raul Alcazar Romero appeals from a judgment entered after a jury convicted him of second degree murder. (Pen. Code, § 187, subd. (a)(1).)[1] He argues there is insufficient evidence to support a verdict, and that the trial court erred by: (1) refusing his request for a pinpoint instruction; (2) giving murder instructions which did not instruct the jury that lack of provocation is an element of murder; and (3) failing to provide an affirmative answer to the jury's question about the burden of proof for provocation. Defendant also argues that the cumulative effect of these errors deprived him of a fair trial. We disagree and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Defendant and Martha McNelis were married from 1980 to 1994. In 1994, McNelis moved out of the home into an apartment in Pasadena and the couple shared custody of their children. McNelis filed for divorce later that year. In the last eight years of her marriage, McNelis was romantically involved with Francisco Mora, McNelis's coworker at the California Institute of Technology (Caltech). McNelis was sexually involved with both defendant and Mora during those eight years. She did not tell her children about the affair and was unsure whether defendant or Mora was the father of her youngest daughter.

During the marriage, defendant was physically violent toward McNelis, sometimes in front of their three children. He told McNelis something would happen to her if she left him, and that he would kill Mora and McNelis if he ever saw them together. When McNelis tried to serve defendant with divorce papers, he pressed a gun to her stomach. None of these incidents were reported to the police. In February 1995, McNelis filed a police report against defendant claiming he was harassing her. Soon after, she obtained a restraining order against defendant.

Two weeks before the shooting, defendant's home burned down. McNelis felt sorry for defendant and allowed him to stay at her apartment. The day before the shooting, defendant showed up at McNelis's second job at El Pollo Loco. He was angry

---

[1] Subsequent statutory references are to the Penal Code.

2

and asked McNelis for chicken. When McNelis gave him the chicken, defendant walked outside of the restaurant, threw the bag of food against the window, and ran away.

On the day of the shooting, McNelis and Mora were both working at Caltech. They decided to have lunch at a nearby pizza restaurant and walked to the parking lot together. As they were pulling out of the lot in Mora's truck, defendant drove by with his sister and nephews in his car. Defendant noticed Mora and McNelis and turned the car around immediately. McNelis and Mora turned back into the parking lot to avoid a confrontation with defendant, but defendant followed them in. Defendant was yelling in Spanish and tried to start a fight with Mora. McNelis told defendant to leave, and defendant responded by throwing a construction measuring tape at McNelis and Mora. As he walked away, defendant told them he would be "coming back."

After defendant left, McNelis and Mora decided to walk to a taco truck to buy lunch, and sat down nearby to eat. About 20-25 minutes later, defendant drove up and parked his car two to three feet from McNelis and Mora. He did not have his sister or nephews in the car. Defendant exited his car while holding a gun with both hands. He pointed the gun at Mora, stated, "Sorry, friend," and shot Mora multiple times. McNelis ran away and when she returned, defendant was gone.

Defendant fled to Mexico, and contacted McNelis on several occasions to threaten her. McNelis moved to Sacramento to be near her sister. In August 1996, McNelis received a handwritten letter from defendant at her sister's address.[2] She felt threatened by the letter and forwarded it to the Pasadena Police Department. McNelis then moved to Napa.

Defendant was arrested by the Mexican authorities and was brought to Los Angeles by United States Marshals in March 2012. Sergeant Michael Villalovos conducted a recorded interview of defendant at the police station, during which defendant

_____

[2] In the letter, defendant wrote he was "never sorry for what I did" and "if [Mora] were to be born again, I would kill him again, I swear. I am never sorry for what I did." He also directed McNelis to "make copies and give one to the police and another one to your bitch of a sister and another one to your bitch of a mother. Tell her when I go down she will be next."

confessed to shooting Mora. Defendant also recounted his strained relationship with Mora and the events that led to the shooting: He claimed that, when Mora was drunk, he would call defendant at home and taunt him. Mora told defendant he "liked [his] old lady, and one day he was going to invite [defendant] over to see him make love to her." Mora also told defendant that he was interested in defendant's young daughters. On one occasion, because Mora was drunk at a party, defendant offered to drive him home. In the car, Mora threatened defendant and grabbed him by the shirt. Mora also made fun of defendant and bragged that he had destroyed three marriages, and that defendant's would be his fourth. Defendant told Sergeant Villalovos that, early in the morning on the day of the shooting, he was driving his nephew to Burbank. Mora drove up to defendant's car and shot at him several times before driving off. Defendant decided to drive to Caltech because his nephew had asked where McNelis worked. According to defendant, when he drove up to McNelis and Mora, Mora mocked and laughed at defendant. Defendant decided to return to Caltech to speak with McNelis and Mora. He brought a gun because he was afraid. When he approached McNelis and Mora, he told Mora, "You have done a lot of damage to me and my family," to which Mora responded by laughing at defendant. Defendant admitted shooting Mora but claimed he did not know what he was doing and that he was frightened. When asked why he did not shoot McNelis, defendant responded that he did not get a chance to because she ran away.

Appellant was charged with murder and the case was tried to a jury. Appellant did not testify at the trial. Omar Romero, the son of McNelis and defendant, testified that he heard the messages that Mora had left for defendant on their answering machine. Omar testified that Mora laughed at defendant in the messages and in one instance, said he was not after McNelis but after defendant's older daughter. Omar testified that when defendant heard these messages, defendant acted a "little angry" and upset. An expert clinical psychologist testified that defendant's decision to shoot Mora was a result of a psychological breakdown resulting from stress.

The trial court instructed the jury on first degree murder, second degree murder, and voluntary manslaughter. The jury convicted defendant of second degree murder and

4

found true the allegation that defendant personally used a firearm. (§ 12022.5, subd. (a).) He was sentenced to 25 years to life in state prison.

This timely appeal followed.

## DISCUSSION

### I

Defendant contends substantial evidence does not support his second degree murder conviction because the prosecution failed to prove that he did not act in a heat of passion.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

Voluntary manslaughter is a lesser included offense to murder. (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) "The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*Ibid.*) "'[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim . . . . The provocative conduct may be physical or verbal, but the conduct must be sufficiently provocative that

5

it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549-550.) "Whether the period of provocation was long or short, the jury should consider all the facts to determine whether 'sufficient time ha[d] elapsed between the provocation and the fatal blow for passion to subside and reason to return.' [Citation.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 571 (*Wharton*).) When voluntary manslaughter and murder are presented to the jury in the alternative, the prosecution must prove beyond a reasonable doubt that legally sufficient provocation was lacking in order to establish the murder element of malice. (*People v. Rios* (2000) 23 Cal.4th 450, 462).)

We conclude that the defendant's conviction of second degree murder is supported by substantial evidence. McNelis was the only witness to the shooting aside from defendant. She testified that, throughout their marriage, defendant had been physically and verbally abusive toward her. Defendant told her that if she ever left him, something would happen to her. When she tried to serve defendant with divorce papers, defendant pressed a gun into her stomach and said if he ever saw her and Mora together, he would kill them both. On the day of the shooting, McNelis and Mora were in Mora's truck, heading to lunch, when defendant drove by with his young nephews and sister in the car. When defendant saw McNelis and Mora together, he turned around and began driving toward them. McNelis suggested that she and Mora return to the parking lot to avoid a confrontation with defendant, and when they did, defendant followed them in. Defendant yelled and tried to fight with Mora. Defendant then threw a construction measuring tape at them, and while leaving, said that he would be "coming back." He returned some 30 minutes later, this time without his nephews or his sister. He parked his car close to Mora and McNelis, and exited the car with a gun in his hands. He told Mora, "Sorry, friend," and shot him multiple times. At no point during their encounter with defendant were Mora and McNelis engaged in affectionate behavior. Mora made no gesture or statement to defendant before he was shot.

McNelis's testimony constitutes substantial evidence to support the jury's verdict, and its implicit rejection of the theory that defendant was reacting to provocation by

6

Mora.  The jury was entitled to credit McNelis's version of events even though it was contradicted by defendant's claim that Mora had laughed at and taunted defendant just before defendant shot him,.  We do not reweigh the credibility of witnesses on appeal. (*People v. Moore* (2010) 187 Cal.App.4th 937, 940.)  McNelis's testimony reveals that defendant sought out and confronted Mora, warned that he would be back, then returned and shot Mora without provocation.  There was no "spark" on the day of the shooting that caused a "powder keg of accumulated provocation to explode." (*People v. Le* (2007) 158 Cal.App.4th 516, 529.)  The jury, properly instructed on voluntary manslaughter as well as first and second degree murder, chose to convict defendant of second degree murder. Substantial evidence supports the verdict.

II

Defendant also presents several arguments challenging the court's jury instructions pertaining to manslaughter and provocation.  We address each issue in turn.

A.      *Refusal of Defense's Proposed Pinpoint Instruction*

Defendant claims he was deprived of his right to due process when the trial court refused to give a pinpoint instruction on extended provocation.

Generally, a defendant is "entitled, on request, to a[n] instruction 'pinpointing' the theory of his defense. [Citations.]" (*Wharton*, *supra*, 53 Cal.3d at p. 570.)  But a court may refuse a proposed instruction "if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon* (2005) 37 Cal.4th 1, 30.)  We review de novo the trial court's refusal to give a requested pinpoint instruction. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)  In doing so, we consider the instructions "'"as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]"'" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111, quoting *People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)

The trial court instructed the jury with CALCRIM No. 570, which states in relevant part, "While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a long or short

7

period of time. [¶] . . . [¶] If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis." Defendant requested a pinpoint instruction stating, "A defendant may act in the heat of passion at the time of the killing as a result of a series of events which occur over a considerable period of time. When the provocation extends for a long time, you may take such a period of time into account in determining whether there was sufficient cooling period for the passion to subside."

The court did not err in refusing defendant's proposed pinpoint instruction, as it was duplicative of CALCRIM No. 570. The given instruction notified the jury that provocation is not necessarily confined to a single occurrence, but "may occur over a short or long period of time." It also instructed the jury to determine whether a reasonable person would have had enough time to cool off and regain his or her clear reasoning; this would require the jury to consider the length and intensity of the provocation. Because we presume the jurors are intelligent persons and capable of understanding the instructions given to them, there was no need to amplify CALCRIM No. 570 with defendant's proposed pinpoint instruction.

Even if defendant were entitled to the pinpoint instruction, any error in not giving it was harmless under any standard. *People v. Gutierrez* (2002) 28 Cal.4th 1083 is instructive. In that case, the defendant requested a pinpoint instruction explaining that provocation can occur over a long period of time. (*Id.* at p. 1142.) The Supreme Court held the requested instruction was duplicative of the jury instructions given, and any error was harmless because "'nothing in [the standard instructions given] *precluded* the jury from finding adequate provocation resulting from conduct occurring over a considerable period of time,' and counsel's argument to the jury fully explicated the defense theme of long-standing provocation in connection with the . . . murder charge. [Citation.]" (*Id.* at pp. 1144-1145.)

Similarly, nothing in the jury instructions in this case precluded the jury from finding sufficient provocation over a long period of time. Defense counsel in closing

8

remarks also stated the provocation was "little by little, building, and building" into a heat of passion. Counsel recounted all of the evidence of provocation, which spanned a considerable length of time, and explained that the jury instruction allowed the jury to find provocation over a period of time.[3] Any error in the court's refusal to give the pinpoint instruction was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)), and there was no reasonable probability the error affected the verdict (*People v. Watson* (1956) 46 Cal.2d 818, 836).

B.     *Jury Instructions on Elements of Murder*

Defendant argues that he was deprived of his Fifth, Sixth, and Fourteenth Amendment rights because, when the court instructed the jury on the elements of murder, it did not include the prosecution's burden to prove a lack of provocation beyond a reasonable doubt.

The People contend this argument is forfeited as defendant did not raise an objection to the instructions on murder in the trial court. Because defendant argues that the omission of an element of the offense substantially affected his rights (*People v. Felix* (2008) 160 Cal.App.4th 849) and that his trial counsel was ineffective in failing to object to the instruction, we address the merits of his argument.

"If provocation is properly presented in a murder case, . . . proving the element of malice requires the People to prove the absence of provocation beyond a reasonable

---

[3]     Defendant contends the prosecution "capitalized" on the incomplete instruction by arguing that heat of passion could not build over a period of time. We do not agree with this characterization of the prosecutor's argument. The context of the prosecution's closing argument makes clear that it was not arguing that heat of passion could not build over time; rather, it was arguing that sufficient time had passed since the acts of provocation for defendant to have cooled off. This is evident from the prosecution's hypothetical questions to the jury: "What would happen if . . . Mr. Mora . . . was saying nasty things to him, that means that the defendant is okay? What if he killed him the next day? What if he killed him in five days? He would still be okay because those things happened before?" The prosecution's reference to defense counsel's remarks that "heat of passion builds over time" was to make the point that, regardless of the provocation, it was for the jury to decide whether there was sufficient time for defendant to have cooled off before shooting Mora.

9

doubt. [Citation.] '[J]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution.' [Citation.] Failure to instruct the jury on heat of passion to negate malice is federal constitutional error requiring analysis for prejudice under *Chapman*." (*People v. Thomas* (2013) 218 Cal.App.4th 630, 644.)

Defendant does not contest that the jury was instructed that it was the People's burden to prove a lack of provocation beyond a reasonable doubt in order to convict him of murder. These instructions were given as part of CALCRIM No. 570, the voluntary manslaughter instructions.[4] Defendant's argument, essentially, is that this instruction should have been given as part of the instructions on the elements of murder, not within the context of voluntary manslaughter. He does not point to authority providing that giving these instructions under the voluntary manslaughter context is reversible error or error at all, and he concedes that jury instructions are evaluated "as a whole, not in isolation." (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1182.) But defendant notes that the jury was instructed with CALCRIM No. 640, which allowed it to consider first degree murder, second degree murder, and voluntary manslaughter in whatever order it wished. Thus, defendant argues, it is possible that the jury did not read the instructions for voluntary manslaughter and consequently, did not consider whether the People proved the absence of provocation beyond a reasonable doubt. This argument ignores the fact that all the instructions were read to this jury, and the jury was instructed to "pay careful attention to all of the[] instructions and consider them together." Nothing in the court's instructions allowed the jury to ignore any of the given instructions. Additionally, any error was harmless beyond a reasonable doubt because the jury was specifically referred to CALCRIM No. 570 when it asked a question to the court during deliberation.

---

[4] The instruction states in relevant part: "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 570.)

10

C.  *Trial Court's Answer to Jury's Question*

Appellant contends he was deprived of his Fifth, Sixth, and Fourteenth Amendment rights when, in response to the jury's question during deliberation, the trial court pointed it to selected jury instructions instead of providing an affirmative response.

"The court has a primary duty to help the jury understand the legal principles it is asked to apply.  [Citation.]  This does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.  [Citation.]"  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)  The trial court's decision to "instruct, or not instruct, in its exercise of its supervision over a deliberating jury" is reviewed for abuse of discretion.  (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)

During deliberation, the jury asked the following question:  "Does the people/D.A. need to disprove the defense case for provocation?  Does the D.A. have the burden of proof to show the defendant was or was not provoked?"  Defense counsel asked the court to respond with an excerpt from CALCRIM No. 570 setting out the People's burden of proof for proving a lack of heat of passion to obtain a murder conviction.  The court noted there was nothing in the jury's question to indicate that it was referring *only* to the issue of provocation as it related to heat of passion, stating "[t]he defense of provocation relates both to reducing it from a first degree to a second degree and then also from a second degree to a voluntary manslaughter."  Over defense counsel's objection, the court directed the jury to CALCRIM 521(first degree murder), 522 (Provocation:  Effect on Degree of Murder),[5] and 570 (Voluntary Manslaughter:  Heat of Passion—Lesser Included Offense).  These instructions already had been given to the jury prior to

---

[5]  CALCRIM 522 states:  "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

11

deliberations.

It was unclear whether the jury was referring to provocation in the context of reducing first degree murder to second degree murder or reducing murder to manslaughter. The trial court considered defense counsel's request and concluded that granting that request would fail to answer the question comprehensively. It then directed the jury to three specific instructions that contained the answer to their questions. We find no abuse of discretion in the court's decision to do so. (*People v. Beardslee*, *supra*, 53 Cal.3d at p. 97, italics omitted ["[The court] must at least consider how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given"].)

Defendant's reliance on *People v. Miller* (1981) 120 Cal.App.3d 233 is unpersuasive. That case dealt with the trial court's refusal to clarify the meaning of "great bodily injury" when asked by the jury, and the original jury instructions did not define the term. (*Id.* at pp. 235-236.) In this case, the answers to the jury's questions were already given in the jury instructions.

Defendant argues that CALCRIM No. 521 "did nothing to address the burden of proof related to provocation" and CALCRIM No. 522 "did not define provocation and did not discuss the burdens of proof at all." Even if this may have caused some confusion to the jury, it was not prejudicial to defendant. Defendant's argument is that the trial court's answer may have misled the jury to believe the People did not have the burden of proving a lack of heat of passion in order to sustain a murder conviction. However, CALCRIM No. 570, which the trial court directed the jury to read again, clearly allocated the burden of proving a lack of heat of passion to the People. Any error was harmless beyond a reasonable doubt, and there is no probability that the jury would have acquitted defendant of murder had the trial court followed defense counsel's suggestion.

III

Finally, defendant argues that he was deprived of a fair trial due to the cumulative effect of the trial court's errors. It is true that a "'series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of

12

reversible and prejudicial error.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) In this case, any errors by the trial court were not prejudicial standing alone, nor did they have a cumulative prejudicial effect. Taking into account defendant's arguments, we are satisfied that he received a fair trial.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**


EPSTEIN, P. J.


We concur:



MANELLA, J.



COLLINS, J.